TENAFLY ERUV ASSOCIATION, INC., Chaim Book, Yosifa Book, Stefanie Dardick Gotlieb and Stephen Brenner, Plaintiffs,

v.

The BOROUGH OF TENAFLY, Ann Moscovitz, individually and in her official capacity as Mayor of the Borough of Tenafly, Charles Lipson, Martha Kerge, Richard Wilson, Arthur Peck, John Sullivan, each individually and in their official capacities as Council Members of the Borough of Tenafly, Defendants.

No. CIV. 00-6051 (WGB).

United States District Court, D. New Jersey.

Aug. 10, 2001.

tiffs seek permission to maintain plastic strips, known as *lechis*, on utility poles in the right-of-way. The Borough of Tenafly, by vote of its Borough Council, denied Plaintiffs' request and ordered that the *lechis*, which had already been attached to the poles without Borough permission, be removed.

Plaintiffs contend that this denial violated their rights to Free Exercise of Religion and to Free Expression under the First Amendment to the Constitution, and their civil rights as protected by 42 U.S.C. §§ 1983 and 1985. Plaintiffs do not raise a claim under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs do claim that the Borough Council violated their rights under the Fair Housing Act, 42 U.S.C. § 3604(a). Plaintiffs now seek to enjoin Defendants from removing the *lechis*.

Richard D. Shapiro, Hellring Lindeman Goldstein & Siegal LLP, Newark, NJ, Robert G. Sugerman, Harris J. Yale, Weil Gotshal & Manges LLP, New York, NY, for Plaintiffs.

Walter A. Lesnevich, Lesnevich & Marzano-Lesnevich Tenafly, NJ, Bruce S. Rosen, McCusker, Anselmi, Rosen, Carvelli & Walsh, P.A. Chatham, NJ, Professor Noah Feldman, New York University School of Law, New York City, for Defendants.

Ronald Chen, J.C. Salyer, American Civil Liberties Union of New Jersey Foundation, Newark, NJ, for Amicus Curiae.

## OPINION

BASSLER, District Judge.

The individual Plaintiffs and the Tenafly Eruv Association, Inc., wish to maintain a ceremonial religious demarcation, known as an *eruv*, in the Borough of Tenafly's municipal right-of-way. Specifically, Plain-

## I. BACKGROUND

### A. *Procedural History*

On December 15, 2000 Plaintiffs Tenafly Eruv Association, Inc., Chaim Book, Yosifa Book, Stefanie Dardick Gotlieb, and Stephen Brenner (collectively "TEAI" or "Plaintiffs"), filed a complaint with the Court, alleging violations of the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1985, and the Federal Fair Housing Act ("FHA") 42 U.S.C. § 3604.

In addition to damages, Plaintiffs sought entry of an Order to Show Cause why a preliminary injunction should not be issued, and for the imposition of temporary restraints. Plaintiffs sought to preliminarily enjoin Tenafly or anyone acting in concert with the town from removing or otherwise disturbing the *lechis* that delineate the boundary of the *eruv*.

After a hearing, the Court entered the Order to Show Cause, and issued a tempo-

rary restraining order to prevent interference with or removal of the *eruv,* pending a preliminary injunction hearing. Pursuant to the Order to Show Cause, a preliminary injunction hearing was scheduled for January 2, 2001.

By consent of the parties, temporary restraints were continued and the preliminary injunction hearing postponed to allow time for limited discovery. Once the parties had completed limited discovery, the Court held an evidentiary hearing, which took place on four separate days during April and May of 2001. After a period for the submission of additional briefing and factual affidavits, the Court heard oral argument on July 19, 2001.

This Opinion is based on evidence developed at the evidentiary hearing and on evidence submitted by affidavit. The Court has also relied upon the exemplary briefs prepared by Plaintiffs, Defendants, and the American Civil Liberties Union ("ACLU") [1] of New Jersey. This Opinion contains the Court's findings of fact and conclusions of law pursuant to Rules 52 and 65 of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

### B. *Eruv Background*

#### 1. *Eruvs Generally*

An *eruv* is a ceremonial demarcation of an area, which has its roots in Jewish Law. According to one of Plaintiffs' experts:

> the institution of the *eruv* has been practiced by the Jewish people for over 2,000 years. It is based on principles derived from the Bible which are developed in the Talmud and codified in the Codes of Jewish Law.... [T]here is an entire tractate of the Talmud which deals with the subject.

(Rabbi Schachter Aff. ¶ 3.)

In the most rudimentary terms, Orthodox Jews believe that Jewish Law bars them from lifting, carrying, or pushing objects (i.e. pushing a wheelchair or carrying an infant) beyond the confines of their homes on the Sabbath. For those who acknowledge its legitimacy, the *eruv* creates a legal fiction, which converts the public domain to a private domain, solely for purposes of lifting, carrying, or pushing on the Sabbath. This allows those who acknowledge the legitimacy of the *eruv* to engage in activities on the Sabbath that are otherwise prohibited by Jewish Law.

The Court adopts the following uncontested definition of an *eruv:*

> An *eruv,* under Jewish law, is an unbroken physical delineation of an area. In tangible terms, it is a defined area created from either natural barriers or artificial means, such as from wires strung across poles. The boundaries of the *eruv* must resemble a series of doorways. In this case the *eruv* consists of existing horizontal wires and vertical black rubber coated casings, known as *"lechis,"* which serve as the sides of the symbolic "doorway."

The *eruv* permits those Orthodox Jews who acknowledge the legitimacy of the *eruv* under Jewish Law to carry or push objects from their residences, i.e. private property, onto other private or public property and vice versa on the Jewish Sabbath and Yom Kippur. These are activities that Orthodox Jews believe are prohibited by Jewish law on the Sabbath and Yom Kippur absent the legal fiction of a private domain.

---

**1.** Appearing by leave of the Court as *amicus curiae.*

(Shapiro Second Suppl. Cert. Ex. H; Defs.' Proposed Findings of Fact at 6-7.)[2]

Defendants submit that the definition of an *eruv* is not complete without an additional paragraph:

> In order to create an efficacious *eruv* under Jewish law, persons creating the *eruv* must rent the enclosed public and private property for valuable consideration from a government official authorized to control the enclosed area.

(Defs.' Proposed Findings of Fact at 7.) While Defendants contend the paragraph describes a "basic fact that is fundamental to the definition of an *eruv*," (*Id.*), Plaintiffs object on grounds that the paragraph does not define what an *eruv* is, and that it is misleading absent extensive additional language. (Shapiro Second Suppl. Cert. ¶ 10.)

Certainly a ceremonial governmental proclamation, conveying some sort of governmental recognition of the area encompassed by an *eruv*, is a factor in establishing an eruv. This conclusion is supported by Plaintiffs' efforts to obtain such a proclamation first from the Borough of Tenafly, and then from Bergen County. (*See* Opinion Section I(C)(3), *infra.*) Nevertheless, Defendants' definition is misleading to the extent it does not make plain the narrow, legally fictive nature of the rental proclamation.

Additional reconciliation of the competing definitions of an *eruv* is not critical to resolution of the issues pending before the Court. Because the ceremonial proclamation issued in this dispute by Bergen County Executive William P. Schuber on December 15, 1999 is referred to frequently by the parties and is demonstrative of the general nature of such proclamations, the Court reproduces it in its entirety:

## PROCLAMATION

WHEREAS, in accordance with the Jewish Orthodox faith the law of the Sabbath contains commandments prohibiting the pushing and carrying of articles on the Sabbath and other Jewish holy days in the public domain except within certain specified conditions; and

WHEREAS, the delineation of an eruv and its construction creates the legal fiction of a private domain in which observant persons of the Jewish faith are permitted to carry or push objects from place to place within the defined area during the Sabbath and other holy days; and

WHEREAS, the office of the Bergen County Executive has been petitioned by the Tenafly Eruv Association, Inc., on behalf of those of the Jewish faith who reside within the County of Bergen, bounded by Booth Avenue and Tenafly Road in Englewood; the Borough of Tenafly; Madison Avenue, Knickerbocker Road and Truman Drive in Cresskill; to rent according to Jewish law, to the Tenafly Eruv Association, Inc, for a period of 30 (thirty) years at a rental rate of one dollar ($1.00), in hand paid, the rights to the aforesaid area for the sole purpose of carrying and/or pushing articles on the Sabbath and Jewish holy days; and

WHEREAS, the office of the Bergen County Executive deems it to be in the public interest of those of its residents for whom the petition has been presented be granted the rights described in the petition; Now therefore,

---

**2.** This definition is largely based on the definition of an *eruv* adopted by the court in *Smith v. Community Bd. No. 14*, 128 Misc.2d 944, 491 N.Y.S.2d 584, 585 (Sup. Ct. Queens Cty. 1985.)

I, WILLIAM P. SCHUBER

Executive of the County of Bergen, New Jersey do hereby proclaim Wednesday, December 15, 1999 as,

## A GRANT OF RIGHTS IN BERGEN COUNTY

The said eruv shall not be valid or binding for any other purpose and this proclamation creates no rights, duties or obligations enforceable in any court whether in law or in equity. This proclamation shall not diminish, increase or affect any other rights granted under New Jersey law, nor shall it be deemed to authorize any physical construction that would otherwise require permission from any local municipal, county or state boards.

(Pls.' Ex. 18, hereinafter the "Bergen Proclamation.")

The Bergen Proclamation is typical of the ceremonial proclamations establishing eruvs in other municipalities, such as: Washington, D.C.; Philadelphia, Pennsylvania; Baltimore, Maryland; Cincinnati, Ohio; Charleston, South Carolina; and Jacksonville, Florida. (Proclamations attached to Chaim Book Cert. as Ex. B.)

All of these proclamations delineate the geographic area that will be bounded by the *eruv*, and rent that area to the group seeking to establish the *eruv* for the sum of $1.00. (*See id.*) All of the proclamations also clearly state that the rights to the domain encompassed by the *eruv* are conveyed for the sole or limited purpose of pushing and carrying on the Sabbath and other Jewish holy days. (*See id.*)

Separate from their disagreement about what constitutes an *eruv*, the parties also disagree about an *eruv's* significance. Defendants contend that the *eruv* is a religious symbol. (Tr. of April 25, 2001 Court Hearing ("4/25/01 Tr.") at

13:7.) Plaintiffs, on the other hand, say that it is not a religious symbol, but that it has religious significance. (*Id.* at 13:11-12.) Again the dispute is not significant for purposes of this Opinion, for even if an *eruv* is not a religious symbol such as a cross or a menorah, it is sufficient for the Court's analysis to conclude that it has religious significance, as Plaintiffs themselves acknowledge.

In practical terms, according to the testimony of an *eruv* proponent, while Observant Jews may live in a town without an *eruv*, it does significantly enhance the practice of their religion. (Test. of Charles Agus, May 1, 2001 ("Agus Tr.") at 122:11-12.) It allows those who recognize it to attend synagogue with their young children in a way that would not be possible without an *eruv*. (Agus Tr. at 123:22-25.) It would also allow them to visit their friends' homes or visit the park on the Sabbath (assuming those places were located within the confines of the *eruv*), while carrying objects or pushing a stroller. (Stefanie Dardick Gotlieb Cert. ¶ 5; Yosifa Book Cert. ¶ 5.) Plaintiffs contend that believers in the necessity of an *eruv* who are presently seeking to move to Tenafly might elect not to do so if the *eruv* is not permitted. (Stephen Brenner Cert. ¶ 6.)

### 2. *The Eruv in Tenafly*

Geographically, the Tenafly *eruv* encompasses an area roughly bounded to the south by the border with Englewood and to the north by Hudson Street in Tenafly. (12/7/00 Letter from Chaim Book to the Mayor and Council of Tenafly, attached to Shapiro Second Supp. Cert. as Ex. F, at 2.) The eastern boundary of the *eruv* runs from Berkley Drive to Ridge Road to Woodland Street, in Tenafly. (*Id.*) The western border is Tenafly Road. (*Id.*) The area links to an existing *eruv* in neighboring Englewood, making it possible for

*eruv*-observant Jews to pass into Englewood on the Sabbath while pushing or carrying objects. (*Id.*) An examination of Joint Exhibit 1, a map of Tenafly delineating the boundaries of the *eruv*, suggests that 35% to 40% of the Borough of Tenafly is located within the current perimeter of the *eruv*.

Physically, the Tenafly *eruv* consists first of the contiguous perimeter of existing, overhead utility lines that run along the streets at the boundary of the *eruv*. These overhead lines form the "tops" of the symbolic "doorways" as described in Plaintiffs' and Defendants' agreed-upon definition of an eruv. In order to convert these active overhead utility lines into an *eruv* under Jewish Law, Plaintiffs were required to attach *lechis* vertically to the utility poles, to form the "sides" of the symbolic "doorways." *Lechis* were attached to approximately 183 utility poles in Tenafly. (Joint Ex. 2.)

In the Tenafly *eruv*, each *lechi* is comprised of the same hard black plastic material as is used by Verizon to cover its ground wires. Plaintiff's Exhibit 34 is an actual section of the *lechi* material used in Tenafly. It is U-shaped, approximately three-quarters of an inch wide by one-half inch deep. When applied to the poles, the *lechi* runs vertically from the ground to the top of the utility pole. (Pls.' Exs. 35(a)-(b).)

Unless a person knew which plastic strips had been hung by Verizon, and which had been hung by Plaintiffs, it would be absolutely impossible to distinguish between a *lechi* and a covered Verizon ground wire. This is demonstrated by Plaintiffs' Exhibits 35(a) and 36(a), photographs that the Court has attached to this Opinion as Appendix A. Exhibit 35(a) pictures a *Lechi*; Exhibit 36(a) a Verizon ground wire cover. After careful observation, the only difference apparent to the Court is that the Verizon ground wire cover is more weathered than the *lechi*, presumably because it has been on the pole for a longer period of time.

### C. *Events Leading to Tenafly's Denial of Permission for the Eruv*

The chronology of events leading to the attachment of the *lechis* to the utility poles in Tenafly's right-of-way and the subsequent denial of the request to leave them in place is largely undisputed. Vehemently contested, however, are the motivations of the individuals involved.

#### 1. *Initial Meeting with Tenafly Mayor Ann Moscovitz*

The first contact between supporters of an *eruv* and the Tenafly Borough government occurred on June 1, 1999.[3] On that date, Mr. Erez Gotlieb and Mr. Gary Osen met with the Mayor of the Borough of Tenafly, Ann Moscovitz, in her office, to discuss the creation of an *eruv* to encompass the Borough of Tenafly. (Moscovitz Aff. ¶ 3.) The gentlemen explained the nature and purpose of an *eruv*, and then sought, in exchange for modest compensation, to have the Mayor issue a ceremonial "rental" proclamation, which would allow the *eruv* to be created under Jewish law. (*Id.*)

While the Mayor had no objection at the time, she indicated to Messrs. Gotlieb and Osen that she did not have the authority to grant or deny such a request, and that a formal proposal would have to be made to

---

**3.** While the Tenafly Eruv Association, Inc. would eventually make the application to Tenafly for permission, conflicting testimony was given about who comprised TEAI's membership. In the interests of clarity, the Court will refer interchangeably to TEAI, its members, and to non-member supporters of the Tenafly *eruv*.

the Borough Council. (Moscovitz Aff. ¶ 4.) The Mayor agreed to raise the issue at the Council's next work session. (*Id.* ¶ 5.)

### 2. *The Tenafly Borough Council Work Session of July 8, 1999*

As she had told Messrs. Gotlieb and Osen, the Mayor did raise the possibility of erecting an *eruv* in Tenafly at a Borough Council work session on July 8, 1999. (*See* July 8, 1999 Borough of Tenafly Work Session Tr. ("7/8/99 Tr."), attached to Shapiro Cert. as Ex. A.) In Tenafly, members of the' public are always invited to attend and listen to these Borough work sessions, but are generally not invited to speak. (Moscovitz Aff. ¶ 5; Borough of Tenafly Council Member Charles Lipson Aff. ("Lipson Aff.") ¶ 2.) The Mayor and Council can make exceptions to this rule, and at the July 8, 1999 work session, the Council voted to allow the approximately thirty residents who attended to voice their opinions on the *eruv*. (*Id.* ¶ 6.)

At the Work Session, the Mayor advocated the *eruv* proposal. For example, the Mayor stated that:

> [I]t's something that could never [be] seen by anybody[;] [there] is nothing significant about this. Anybody not looking for it would [never] know it was even there. It's not an obvious thing but allows these people to bring their children to temple. That's all. You know, whether it makes sense to you or not is not really important. . . . I mean we don't have to agree with everyone's religion . . .

(7/8/99 Tr. at 2.) [4] Shortly thereafter, the Mayor commented:

> It's such an innocuous thing. It's something that nobody can see or know that's there. It's a religious thing, and we have a reputation in this town of permitting people to go to whatever church they wish to go to or temple they wish to go to and to bring their children.

(7/8/99 Tr. at 4.) The Mayor stated she "would be very upset if this Council did not permit such a simple request." (7/8/99 Tr. at 5.)

The Work Session did not focus on whether permission should be granted for use of municipal property for an *eruv*, or whether such permission was required. Instead, the Mayor indicated that "[t]he only reason really that it has to come before us here is because they have to give us something, they have to rent it for the purpose of being an Eruv." (7/8/99 Tr. at 4.) In fact, it appears that the Council's only concern was whether to issue the ceremonial proclamation:

> Mayor: It's certainly [not] as obvious as having a creche in Highland Park. You know it's just municipal property. I'm not sure we can even stop them from doing it, but, you know, it's not.
>
> [Lesnevich]:[5] You can stop them. They can't force you to rent it to them for a dollar, they can do whatever they want as far as calling it what they want within their concept but they could not force you to sign an ordinance renting it.

---

4. The transcript of the July 8, 1999 work session was unofficially prepared by counsel for Plaintiffs. (Shapiro Cert. ¶ 2.) Defendants have not objected to either its authenticity or its admission into evidence. The Court will cite to speakers at the hearing by name to the extent that the transcript, other pleadings, or a review of the audio tape of the hearing make the speaker's identity apparent. Any unidentified speakers will be referred to as Man #1, Woman #3, etc.

5. Borough Attorney Walter Lesnevich.

Man: I was told they can deal directly with the Cable Company.

[Lesnevich]: If they dealt with the cable company it's nothing you can do about it because Cablevision can do, they have the right to do that.

Man: That was my understanding.

* * *

[Kerge]:[6] I think the issue really, probably has to do with a recognition, their recognition of their being able to do it. If they can go directly to cable and they don't need to rent, to have any agreement from us, then why not do that. Wouldn't that be easier?

[Lesnevich]: I don't know perhaps. I certainly don't know the answer. Their theology requires that government, governmental entity to give the rental as opposed to a commercial enterprise.

(7/8/99 Tr. at 6-7.)

Notably absent from the Council's discussion was any mention that even if permission were granted by the telephone or cable companies to use the poles, permission would still be required from the Borough to use the municipal right-of-way. As Plaintiffs correctly note, Borough Counsel Walter Lesnevich did not mention that municipal approval would be required not only for issuance of a ceremonial proclamation, but also for use of the Borough's right-of-way. (Chaim Book Cert. ¶ 14.)

For the remainder of the hearing, the Council and public discussed the propriety of issuing the ceremonial "rental" proclamation, and what impact that proclamation and the attendant establishment of an *eruv* might have on Tenafly. The meeting was contentious, and numerous members of the public voiced their objections to the eruv. The mayor herself was "shocked and dismayed by the reaction of some of the residents present." (Moscovitz Aff. ¶ 6.)

The statements in opposition to the *eruv* were initially innocuous. For instance, one person who spoke stated:

suppose another religion comes before us and they ask us to allow them to do something that's for their religion. I don't know what that religion could be or what it is, but once we establish the fact that we do something special for one particular sect of a religion we open ourselves to allow, again to allow anybody and use that as a precedent to establish whatever they want to do.

(7/8/99 Tr. at 6.)

Discussions quickly turned away from the precedent that might be set for other groups, and to concerns that had been voiced to the Council by some residents that the establishment of an *eruv* might lead to the formation of an Orthodox community in Tenafly:

Man:[7] . . . Some of my Jewish friends object[ ] to this very strongly and you know, Jewish faith and tell me why?

Mayor: I have no answer for you.

Man: I've heard why.

---

6. Tenafly Borough Council member Martha Kerge. At the time she made this statement, she was not clear whether the wires or the poles where on Borough property, and thus whether the permission of the Council to erect the *eruv* was required. (Kerge Aff. ¶ 3.)

7. The Court believes that the man with whom the Mayor spoke in this conversation was a Borough Council member.

**152**

Mayor: Why?

Man: They think we're going to turn it into an Orthodox Community.

Mayor: Really? Are we going to become Orthodox because of wires going on the poles?

Man: That's a stretch. That's a real stretch.

Mayor: That's a real stretch. I'm not going to become Orthodox, see?

Man: I'm not impugning any religion at this point in time. I'm not imputing the Orthodox at all, but that seems to be a concern that the Orthodoxy would take over.

Mayor: That's what Adrian Meltzer said I believe when she voted against having the Lubavitch in town in the first place. I think that's a terrible thing to do. I cannot believe it.

(7/8/99 Tr. at 7.)

This theme was echoed by many of those who got up to speak after the work session was opened to the public. For example, one resident stated that an *eruv* "[i]n essence has the potential for changing the entire character of the community." (7/8/99 Tr. at 9.) He noted that in a community where his brother had lived, after the creation of an *eruv* "the entire community changed over a period of five to ten years to the point where shopkeepers were ostracized if they kept their shops open on Saturday on the Sabbath." (*Id.*) The resident continued:

It is not simply a matter of being able to carry your child to the synagogue, they have been able to go to synagogue for five years with nobody interfering. This is something that has considerable implications in terms of changing the social community. It makes it part of their private domain. I personally object to the use of our public property to converting it to anyone's private domain. . . . I just know the social changes as [Councilman Lipson] intimated it is more than this simple innocuous thing. I have no intent in becoming involved in trying to keep out certain religions and this is not a matter of anti-Semitism or keeping out any religion or any church. It's a matter of not allowing any church or any religion to impose their beliefs and their use of our public properties beyond what it should be.

(*Id.* at 9-10.)

The next resident to speak against the *eruv* began by echoing concerns that the grant of a ceremonial proclamation to proponents of the *eruv* might constitute a violation of the separation between church and state. (7/8/99 Tr. at 12.) His comments then shifted to a concern for the community impact of the Borough's decision. He stated:

Well, they start to insist that shops close on Saturday. If they start to try to think of the neighborhood as their sole possession. The attitudes of community change. So, I would say this is not a simple issue about cables on poles. This is much more an issue the character of a community being committed to diversity rather than beginning to be separate sectors supporters of a town. And therefore I very strongly oppose this as a person who absolutely would be there at the drop of a hat to protect their free exercise of religion. This is not about that.

(7/8/99 Tr. at 12-13.)

In response to the comments, the Mayor asked whether there was a concern about the symbolic rental of the town. (*Id.*) The Mayor noted that while a symbolic rental of Tenafly had concerned her as well:

Having the wires go up and having, symbolically wrap around the town didn't bother me at all because it's something that isn't seen, it isn't an imposition on anybody else, anymore than having a little k with a circle on your margarine is going to make you kosher.... The part that really was a concern to me was the word rental. That they were renting the city of Tenafly.

(*Id.*)

Speakers again reiterated their concern about the *eruv's* potential to change the community:

I think that Tenafly, that most of us would agree that the community is very diverse, and the people of all nationalities and all religions, I mean, there's no block in town that's like Korean or a Chinese quarter. It's a small town and the beauty of it is the diversity and the richness and that's what I think we're all about. I would worry that by our giving this, we're saying that they have a right to have a community in our community, and our community is so small, it's not like we're so big that they need to congregate in one area.... I just don't see a need to give this to them because we're all about diversity and they're free to wherever they want.

(7/8/99 Tr. at 14-15.)

The last member of the public to speak at the work session voiced her thoughts on an *eruv's* impact on nearby Teaneck, New Jersey. (7/8/99 Tr. at 18-19.) During Tenafly's debates on whether an *eruv* should be constructed, the social changes in Teaneck were oft-cited worst-case examples of the impact an *eruv* might have on a community. In the citizen's opinion, the Council should:

Just take a look at what happened in Teaneck. Teaneck was beautiful. I love this area. I've lived here for 65 years. I used to shop in Teaneck when I lived in Englewood. Teaneck had beautiful stores. Almost every store in Teaneck today is geared towards the Orthodox. There is a racial imbalance in the school system in Teaneck because most of the Orthodox children go to Yeshivas and they go to religious _____. Who's left in the Teaneck school system but those children [who] can not afford to go to a private school. There is a serious imbalance there and I have concern that this could possibly happen to Tenafly because the more ... If this is granted, let's all be honest, more and more Orthodox people are going to move here. The more people that move here, they're not going to buy their meat in the Grand Union, they're going to want to go to Glat Kosher Orthodox store. They're going to be looking to open up businesses in Tenafly. They're going to have the same thing that happened in Teaneck. This is my concern. I have no children in school anymore, but I am concerned about the school system, and I am concerned about what will come in to our local shopping areas. And I think that we should seriously consider this.

(7/8/99 Tr. at 19.)

As the hearing drew to a close, a member of the Council [8] implored those present that:

I'm serious. We can't be flippant. This is a very serious concern ....[a]nd it's a concern that I have ... that's expressed from, by a lot of people about a change in the community. And it's true, it does become a change in the community. It's become a change in every community

---

8. The Court believes this statement was made by Councilman Charles Lipson. (Chaim Book Cert. ¶ 14; Lipson Aff. ¶ 3.)

where an ultra-orthodox group has come in. They've willed the change. They've willed a change in the state of Israel. They've willed it so much so that they've stoned cars that drive down the streets on the Sabbath. Ultra-Orthodox. My friend's son became an Ultra-Orthodox person so I'm not ___ that's that person's belief if that's that person's belief, and that person has the right to have that belief and I'm not denigrating that belief. . . .

(7/8/99 Tr. at 19.)

At the conclusion of the Work Session, the Council decided without a vote not to pursue the *eruv* issue unless a formal, written request was made of the Council. (*Id.* at 21.) At the time this decision was made, members of the Council were aware that Tenafly had been threatened with suit in an unrelated religious matter, and that the Borough had been the subject of past litigation in a religious dispute.[9] (*Id.* at 10.)

The Mayor agreed to inform the gentlemen she had spoken with about the need for a formal written request for issuance of a ceremonial proclamation, and that the matter could be placed on the calendar for September if they so desired. (*Id.* at 21-22.) After the meeting, the Mayor contacted Mr. Gotlieb on the phone (since neither he nor Mr. Osen had been at the work session), and informed him that because of concerns she and others had with the symbolic rental of the streets of Tenafly, she did not feel the Council was favorably disposed to grant the application for issuance of a ceremonial proclamation. (Moscovitz

Aff. ¶ 6.) Nonetheless, the Mayor did invite Mr. Gotlieb to make a formal application and proposal at a public meeting, so that there would be an official public vote. (*Id.* ¶ 7.) No such formal application was made to the Borough Council prior to the construction of the Tenafly *eruv.*

### 3. *Construction of the Tenafly Eruv*

Realizing that the Tenafly Borough Council was not likely to issue the ceremonial proclamation they sought, in or about August of 1999 representatives of TEAI approached the office of Bergen County Executive Pat Schuber and asked if he would issue the ceremonial proclamation. (Chaim Book Cert. ¶ 16.) Since Tenafly is within Bergen County, a proclamation from the County Executive would be sufficient for TEAI's purposes, and allow them to erect an *eruv* according to Jewish Law. (*Id.*)

Plaintiffs assert that they were informed by Bergen County's legal counsel that there was no legal impediment to Bergen County's issuing the proclamation they sought, and that Executive Schuber had agreed to do so. (Chaim Book Cert. ¶ 17.) On or about December 15, 1999, Bergen County Executive Schuber issued the ceremonial proclamation. (Chaim Book Cert. ¶ 18; Pls.' Ex. 18.)

With ceremonial proclamation in hand, Plaintiffs claim to have had a good faith belief that approval of the Tenafly Borough Council was not necessary to use the utility poles and that approval of Bell At-

---

9. While the Court is not familiar with all of the facts, from the hearing transcripts it appears to the Court that Tenafly was either involved in or threatened with litigation surrounding the zoning of the Lubavitch Jewish temple in Tenafly, and surrounding a creche and menorah in one of its public parks. The litigation as to the creche seemingly placed Tenafly between an ACLU Establishment Clause claim on one side, and a Lubavitch Free Exercise claim on the other. According to Tenafly Borough Administrator Joseph DiGiacomo, the Tenafly Borough Attorney is presently drafting an ordinance to permit such installations. (Test. of Joseph DiGiacomo, April 30, 2001 ("GiGiacomo Tr.") at 26:5-27.)

lantic Telephone Company (subsequently re-named and referred to hereinafter as "Verizon"), the owner of the poles, would suffice. (Chaim Book Cert. ¶ 19.) The Court finds this assertion to be credible. The Court reaches this conclusion because after a review of the July 8, 1999 Work Session transcript and audio recording, a reasonable witness to those proceedings could have concluded that while Borough permission was required for issuance of a ceremonial proclamation, someone seeking to hang wires on the utility poles could contact either the telephone or cable company directly. (*See, e.g.,* 7/8/99 Tr. at 6-7.)

Acting upon this good faith belief, in April, 2000 Plaintiff Chaim Book sought Verizon's permission to attach the *lechis* necessary for the *eruv* to Verizon's poles.[10] (Chaim Book Cert. ¶ 19.) Prior to granting permission to use the poles, Verizon required that TEAI complete Verizon's standard *eruv* license agreement and secure adequate insurance for the *eruv* materials. (*Id.* ¶¶ 20-22.)

Verizon also requested evidence of the legal authority TEAI had to place and maintain *eruv* materials on the utility poles in Tenafly. (Chaim Book Cert. ¶ 20.) Plaintiffs claim that they informed Verizon about the Bergen Proclamation and about their belief that local municipal approval was not required. (*Id.*) Plaintiffs further assert that an in-house attorney for Verizon engaged in independent legal research as to whether local municipal approval was required and concluded that it was not. (*Id.*) Apparently satisfied that all legal requirements had been met, on June 5, 2000

Verizon granted TEAI permission to use its poles. (*Id.* ¶ 21.)

In mid-June, 2000, Cablevision, holders of the cable television franchise in Tenafly, agreed to assist Plaintiffs in affixing the *lechis* to Verizon's utility poles as a community service. (Chaim Book Cert. ¶ 24.) Cablevision provided the personnel and trucks for this undertaking. (*Id.*) With the assistance of Cablevision, the Tenafly *eruv* was completed in September, 2000. (*Id.*) Plaintiffs represent that because the *eruv* will remain privately supported, no municipal maintenance will be required. (*Id.* ¶ 51.)

### 4. *Tenafly's Response to the Eruv*

In late August, 2000, the Borough of Tenafly became aware that an *eruv* had been constructed without its permission, when residents adjacent to the Tenafly Nature Center informed Councilwoman Martha Kerge, the Mayor, and the administration that a wire had been hung through the Nature Center. (Moscovitz Aff. ¶¶ 10-11; Kerge Aff. ¶ 5.)[11] Since no permit had been issued to hang this wire, the Mayor ordered the wire be removed. (*Id.*)

When it came to the Mayor's attention that Bergen County Executive Pat Schuber had issued the ceremonial proclamation, she contacted his office "to complain about the propriety of his issuing a proclamation concerning the use of our municipal property." (Moscovitz Aff. ¶ 12.) Plaintiffs claim that Executive Schuber's Chief of Staff informed the Mayor that Mr. Schuber had no plans to rescind the proclama-

---

**10.** It is undisputed that the utility poles themselves are the property of Verizon. *See* Tenafly Ordinance 1127, "An Ordinance Granting Permission and Consent to New Jersey Bell Telephone Company ..." (Walter Lesnevich Suppl. Sub. Of 7/20/01.)

**11.** Borough Administrator DiGiacomo submitted in his affidavit that he heard about the wires in or near the nature center in December, 1999. (DiGiacomo First Aff. ¶ 1.) The Court is not aware of any other evidence that indicates an *eruv* was under construction at such an early date.

tion, as it constituted a reasonable community accommodation. (Chaim Book Cert. ¶ 29.)

Councilwoman Kerge also contacted the Bergen County Executive, to question Mr. Schuber's authority to issue a proclamation binding on Tenafly. (Kerge Aff. ¶ 4.) Plaintiffs claim that Councilwoman Kerge not only questioned the proclamation but sought its recission, and claim that the Mayor and others contacted Verizon to seek a revocation of the *eruv* agreement. (Chaim Book Cert. ¶ 30.) Plaintiffs did not adduce any evidence to support these allegations.

### 5. *September 14, 2000 Conversation*

On September 14, 2000, in an attempt to resolve the dispute, Mayor Moscovitz and Councilman Charles Lipson met with Rabbi Shmuel Goldin of Congregation Ahavas Torah in Englewood, New Jersey, and Joy Kurland, Director of the Jewish Community Relations Council. (Chaim Book Cert. ¶ 32; Rabbi Goldin Aff. ¶ 7.) While the occurrence of this meeting is undisputed, what was said is not.

According to Rabbi Goldin, he made it clear to those present that he was not acting as a representative of TEAI, and merely came as an interested member of the public who was familiar with the concept of an *eruv*. (Rabbi Goldin Aff. ¶ 8.) After he had discussed the reasons for an *eruv* and the logic behind it, the Mayor expressed her concern about the symbolism of the Borough "renting the town". (*Id.* ¶¶ 9, 10.) Rabbi Goldin explained that the Bergen Proclamation did not have such a legal effect, and pressed the Mayor for what her real concerns were.[12] (*Id.*)

Allegedly, the Mayor said that her real concern was that she "didn't want them moving in." (*Id.* ¶ 11; Test. of Shmuel Goldin, May 1, 2001 ("Goldin Tr.") at 127:15-21.) Rabbi Goldin interpreted "them" to be Orthodox Jews. (*Id.*) The Mayor also expressed a concern that Orthodox Jews might throw stones at cars which passed on the Sabbath, or would block traffic on Saturdays by walking in the streets. (*Id.* ¶ 12.) She became quite emotional in describing the anti-Jewish discrimination she had experienced when she first moved to Tenafly, but expressed her pride that the Borough had evolved sufficiently to permit her to become its first Jewish Mayor. (*Id.* ¶ 13.) The mayor then allegedly expressed her concern that an influx of Orthodox Jews would jeopardize the acceptance and progress already achieved by the Jewish population in Tenafly. (*Id.* ¶ 14.)

Rabbi Goldin objected strongly to these alleged statements. It is undisputed that at one point he attempted to leave the meeting. (*Id.* ¶ 14.) Ms. Kurland and the Mayor prevailed upon him not to do so, and the meeting continued. (*Id.*; Moscovitz Tr. at 81:10-15.)

According to the Mayor any perceived hurtful comments were not properly attributable to her, but instead to members of the public whom she was quoting. (Moscovitz Tr. at 77:17-25, 78:1-7.) The Mayor contends that Rabbi Goldin twisted her words and the opinions of others and threw them back at her in his affidavit. (Moscovitz Aff. ¶ 16.) While she did admittedly relate a story about how Orthodox Jews had thrown stones at her daughter while her daughter was horseback riding on the Sabbath, she related it merely as a point of fact. (*Id.*; Moscovitz Tr. at 80:21-

---

12. During her testimony before the Court, the Mayor acknowledged that the Bergen Proclamation has absolutely no effect on civil law.

(Test. of Ann A. Moscovitz, May 1, 2001 ("Moscovitz Tr.") at 77:7.)

23.) Councilman Lipson has also indicated that while Rabbi Goldin may have perceived some of the Mayor's comments to be offensive, he personally did not consider any of the Mayor's statements to be offensive. (Lipson Aff. ¶ 7; Test. of Charles M. Lipson, May 1, 2001 ("Lipson Tr.") at 20:16-24.)

Having heard live testimony from Mayor Moscovitz, Councilman Lipson, and Rabbi Goldin, the Court credits Rabbi Goldin's testimony, to the extent that he described his perceptions of the meeting with the Mayor and Councilman Lipson. It is uncontested that the Rabbi got up to leave the meeting, and that he did so after taking offense at statements that were made by the Mayor. While the Court does not reach the question of whether the Mayor intended to make comments that were offensive to Orthodox Jews, it is certainly apparent that to some degree she succeeded in doing so. That having been said, the Court does not believe the Mayor said she "didn't want them moving in" in light of her recorded statements in support of the *eruv* at the July 8, 1999 Work Session.

Plaintiffs contend that at the conclusion of the meeting a compromise was proposed, whereby the Borough would "drop the matter" if the TEAI agreed not string any additional wires through the town, removed existing wires in the nature center, and limited placement of its *lechis* to the utility poles. (Chaim Book Cert. ¶ 34; Rabbi Goldin Aff. ¶¶ 16-20.) Defendants assert that no such agreement was reached. (Lipson Aff. ¶ 8.) Suffice it to say, nothing came of the negotiations, and no compromise was reached. (*See* Pls.' Ex. 17.)[13]

### 6. October 31, 2000 Conversation

On or about October 31, 2000, Charles Agus, a supporter of the *eruv* in Tenafly but not a named Plaintiff in this matter, contacted Mayor Moscovitz in hopes of opening a dialogue on the subject of the eruv. (Agus Cert. ¶ 4.) During this approximately hour-long conversation, he and the Mayor discussed the views of those community members who oppose the establishment of the *eruv*. (*Id.* ¶ 5; Moscovitz Aff. ¶ 19; Moscovitz Tr. at 91:1-101:6.)

According to Mr. Agus, during this conversation the Mayor implied that Teaneck's Orthodox Jewish population was responsible for the decline in Teaneck's public school system and responsible for the stores there closing on Saturday or going out of business. (Agus Cert. ¶¶ 6, 12; Agus Tr. at 115:6-116:13.) He claims the Mayor also implied that the establishment of an *eruv* in Tenafly might cause more Orthodox Jews to move to Tenafly, which would lead to the establishment of many small synagogues in Tenafly (the so-called "Spring Valley Phenomenon" so named after a town in New York with a large Orthodox population). (Agus Cert. ¶ 10; Agus Tr. at 116:2.) To support her assertion, the Mayor allegedly commented that a broker in Englewood had informed her forty families were waiting to move to Tenafly if an *eruv* were established. (Agus Cert. ¶ 11; Agus Tr. at 116:7.)

The Mayor denies Mr. Agus's allegations, and contends that she merely posed Mr. Agus a question, about what he thought the impact on the public schools would be if a large number of people moved to Tenafly and then withheld their children from the schools. (Moscovitz Aff. ¶ 19; Moscovitz Tr. at 95:14-15.) She also

13. Borough of Tenafly Council member John Sullivan also engaged in discussions about possible alternatives to erecting the *eruv* on municipal property with Mr. Book and Mr. Jay Nelkin. Again, nothing came of these discussions. (*See* Test. of John Thomas Sullivan, May 8, 2001 ("Sullivan Tr.") at 18:11-20:1.)

allegedly never said that the Businesses in Tenafly would be harmed, but instead said they would "change" and perhaps close on Saturdays. (Moscovitz Tr. at 98:10-11.)

Mr. Agus's impression of the conversation was that the Mayor had sincere concerns about the potential influx of Orthodox Jews, "was opposed to the *Eruv,* and . . . had serious concerns about the *Eruv's* future impact on the demographic makeup of the town." (*Id.* ¶¶ 14, 15.) Defendants counter that Mr. Agus misinterpreted the Mayor's words, and read into the conversation negative intent where there was none. Having heard both Mr. Agus and the Mayor testify regarding this matter, the Court credits Mr. Agus's testimony.

#### 7. *Tenafly's Efforts to Remove the Eruv*

On September 26, 2000, at the request of the Mayor, the Borough Administrator contacted Cablevision to inquire about why they had aided in construction of the *eruv* without permission of the Borough. (DiGiacomo First Aff. ¶ 8.) He was allegedly informed that a Rabbi had represented to Cablevision that TEAI had obtained all of the necessary municipal permits. (*Id.*)

On October 10, 2000, at the direction of the Mayor and Council, Borough Administrator DiGiacomo wrote to Cablevision requesting that the *lechis* be removed from the poles as soon as possible. (*Id.* ¶ 8-9.) On October 23, 2000, Cablevision wrote to Plaintiffs and informed them that they had been asked by the Borough to remove the *eruv* material. (Chaim Book Cert. ¶ 39; 10/23/00 Letter from Cablevision to Pls.,

attached to Chaim Book Cert. as Ex. C.) In that letter, Cablevision stated in operative part:

> As you know, Cablevision agreed to assist you with the *Eruv* project in Tenafly as a community service in reliance upon your representation that you had obtained all authorizations necessary to place these plastic holders in the public right-of-ways. You provided us with copies of the pole licenses, but we have now been notified by the municipality that you never obtained the consent of the Borough for use of the public right-of-ways. As a result, Cablevision has been instructed by the municipality to immediately remove these plastic holders.
>
> Accordingly, this letter serves to notify you that, unless you can present us with a duly authorized right to use the municipal rights-of-way for the purpose of the *eruv,* Cablevision shall be compelled to honor the municipality's request and shall commence taking the holders down within three days of your receipt of this letter.
>
> We regret the position in which we find ourselves and hope you understand that Cablevision cannot afford to jeopardize its relationship with the Borough or its franchise to provide telecommunications services within the Borough.

(10/23/00 Letter from Cablevision to Pls., attached to Chaim Book Cert. as Ex. C.)[14]

After receiving the letter from Cablevision, counsel for Plaintiffs were able to come to an agreement with the Borough,

---

**14.** Plaintiffs argue, based entirely on the third paragraph of the Cablevision letter, that Tenafly threatened Cablevision's franchise. While Mr. DiGiacomo admitted that he was asked to inform Cablevision that the *eruv* had been erected without permission, he flatly denied ever threatening their franchise. (DiGiacomo Tr. at 23:4-16.) In his defense, he claimed the Borough would have been unable to threaten their franchise, since the renewal process was tightly regulated by state law, and would not occur again until 2008. (*Id.* at 23:22-24:8.) The Court credits Mr. DiGiacomo's testimony, and concludes that aside from Plaintiffs' interpretation of the third paragraph of the letter, there is absolutely no evidence that the Borough of Tenafly threatened Cablevision's franchise.

which allowed the *eruv* to remain up for a period of thirty days so that TEAI could file an application with the Borough Council for permission to retain the *eruv* in place. (Chaim Book Cert. ¶ 41; DiGiacomo First Aff. ¶ 10.) This agreement was memorialized in a letter from Plaintiffs' counsel to the Borough Attorney. (11/2/00 Letter from Shapiro to Lesnevich, attached to Pls.' Ex. 14.) That letter reads in part:

> I also appreciate your advice that the Borough has no specific ordinance covering this matter or any particular format for ·the *Eruv* Association to follow in submitting its request. A written request will be promptly submitted.

(*Id.* at 2.)

In accordance with the agreement, an application was filed with the Borough on November 7, 2000. (Chaim Book Cert. ¶ 42; Appl. attached to Compl. as Ex. A.) This application did not seek a ceremonial proclamation or any other endorsement by the Borough of Tenafly; instead it only asked "the members of the Borough Council not to remove, or order the removal of, the '*Lechis* ' on the utility poles in the Borough of Tenafly." (Compl. Ex. A at 2.)

To aid in the Borough's consideration of the request, on November 20, 2000 Estie and Charles Agus sent a packet of informational materials to the Council. These materials included their synagogue's vision statement (which explained their reasons for seeking an *eruv* in Tenafly) (Pls.' Ex. 15), a letter from the United Jewish Appeal asking that the *eruv* be permitted (Chaim Book Cert. Ex. B), a letter sent from President George H.W. Bush to a Jewish congregation in Washington, D.C. expressing support for their *eruv* (Chaim Book Cert. Ex. A), and a list of responses to potential objections to the *eruv* (Pls.' Ex. 16).

### 8. *The November 21, 2000 Work Session*

At a work session on November 21, 2000, the Borough Council discussed how to proceed with TEAI's application. (*See* November 21, 2000 Borough of Tenafly Work Session Tr. ("11/21/00 Tr."), attached to Shapiro Second Suppl. Cert. as Ex. G.) After limited discussion, the Council agreed to hear TEAI's formal proposal at a public hearing to commence on November 28, 2000. (11/21/00 Tr. at 8.) Because it was known that Councilman Richard Wilson and Councilman Lipson would miss the November 28th hearing, the Council planned to begin the hearing on November 28th, and conclude it on December 12th, 2000. (*Id.*)

According to Borough Attorney Lesnevich, the application to the Borough Council was "not viewed as a sign application. It was viewed as a use of the right-of-way. That is why it went right to the Mayor and Council." (4/25/01 Tr. at 21:24-25, 22:1.) In the eyes of the Borough Attorney, Plaintiffs' request fell under Tenafly Ordinance 691, which prohibited the placement of any materials in the right-of-way.[15] (*Id.* at 22:5-

---

**15.** Borough of Tenafly Ordinance 691, which was enacted in 1954, provides in relevant part:

> No person shall place any sign or advertisement, or other matter upon any pole, tree, curbstone, sidewalk or elsewhere, in any public street or public place, excepting such as may be authorized by this or any other ordinance of the Borough.

(Tenafly Ordinance 691 Article VIII(7).) While the Ordinance is absolute on its face and does not provide for legislative determinations of whether uses not contemplated by an Ordinance may be permitted, at least one member of the Council was operating under the perception that it did. According to Borough of Tenafly Council member Arthur Peck, he was under the impression that for the placement of anything in the Borough's right-of-way, an ordinance required that an application be made to the Borough, that a hearing be held, and that a vote be taken by the Mayor and

23.) In his estimation, any contrary use would have to be approved by the Mayor and Council. Although Defendants also submitted a copy of Tenafly's sign ordinance to the Court, according to the Tenafly Borough Attorney the decision to deny TEAI's application was not made based on the provisions of that ordinance, but was instead based only on Tenafly Ordinance 691. (*Id.* at 24:6-21.)

### 9. *The November 28, 2000 and December 12, 2000 Public Hearings*

At the two hearings on November 28 and December 12, 2000, fifty-four members of the public rose to speak on the *eruv* matter. A handful of these individuals spoke at both hearings. Of the total, approximately twenty-six spoke in favor of the *eruv*, and twenty-five spoke against it. The remainder made either neutral comments or asked rhetorical questions of the crowd.

Borough Attorney Lesnevich imposed ground rules for the hearings, whereby dialogue between members of the public and the Council was not permitted. (November 28, 2000 Borough of Tenafly Public Hearing Tr. ("11/28/00 Tr."), attached to Shapiro Cert. as Ex. B, at 13:12-23.) Council members were instructed not to respond to questions, since the hearing was viewed as an opportunity for them to listen to what the public had to say. (*Id.*)

At both hearings Chaim Book, spokesman for TEAI, was afforded the opportunity to frame Plaintiffs' request to the Council. (11/28/00 Tr. at 13:6-7; December 12, 2000 Borough of Tenafly Public Hearing Tr. ("12/12/00 Tr."), attached to Shapiro Cert. as Ex. C, at 16:13-20:10.) At the November 28, 2000 hearing, after initially apologizing for the manner in which the *eruv* came to the community's attention, he explained in great detail what had drawn him to Tenafly, what an *eruv* was, and why he felt it would be beneficial to have an *eruv* in Tenafly. (11/28/00 Tr. at 14:10-34:10.) He also explained how it was an *eruv* had come to exist on the Borough's utility poles, despite the absence of Borough permission for it. (*Id.*) Lastly, he discussed the case of *ACLU of New Jersey v. City of Long Branch,* 670 F.Supp. 1293 (D.N.J.1987), which held that eruvs may be permitted by a municipality without fear of violating the Establishment Clause. (12/12/00 Tr. at 32:14-33:21.)

After Mr. Book's introductory statement, the remainder of the November 28, 2000 hearing was comprised of an even mix of commentary both for and against the *eruv*. While one member of the public commented that "the hate and the bitterness in th[e] room [was] overwhelming," (11/28/00 Tr. at 81:6-7), the next speaker took issue with that statement, and said "I kind of resent the idea … that there's a palpable hatred and bitterness that's exhibited. I think there's a disagreement, no question about that, but I don't equate disagreement with hatred and bitterness." (*Id.* at 81:21-82:4.)

Having had an opportunity to listen to the audio tape of the hearing, the Court finds that the second comment is a fairer assessment of the November 28, 2000 hearing. Although comments at the November 28th hearing occasionally mimicked the statements that were made at the first hearing in July of 1999, far more *eruv* supporters were present to make their case at the November 28, 2000 hearing.

The statements made in opposition to the *eruv* at the November 28th hearing highlighted the major themes that run through this dispute. Residents were con-

Council. (Test. of Arthur Peck, April 30, 2001 ("Peck Tr.") at 95:10-13.)

cerned that the *eruv* had been erected without permission, might violate the separation between church and state, would cause the Borough to lose control of its right-of-way, would lead to the formation of an insular "community within a community," would be divisive and destructive to Tenafly, and was unnecessary given the self-imposed religious restrictions it was designed to alleviate.

By way of example, residents felt that Tenafly should not favor one particular religious group. (11/28/00 Tr. at 38:23-39:21.) Others took issue with the fact that the Borough Council had been circumvented when Bergen County was contacted for issuance of the ceremonial proclamation, and that this proclamation had been used to secure permission from Verizon and Cablevision to hang the *eruv* without the Borough's permission. (*Id.* at 41:7-11.) It was also noted that it is not the place of the Borough to be involved in religion. (*Id.* at 79:7-10.)

There was also the oft repeated concern that just because *Long Branch* permitted a town to have an *eruv*, the decision did not require a town to do so, and that in a small, diverse town such as Tenafly an *eruv's* "artificial contrivance to get around Orthodox Judaic religious laws" would set a terrible precedent for future actions by the town. (*Id.* at 42:1-20.) It was opined that letting any one group have such religious access to the right-of-way would make it impossible to differentiate between requests in the future, or establish a precedent that could not later be undone. (*Id.* at 44:19-22, 70:18-22, 73:2-5.) Others took issue with the erection of a permanent structure on public property to aid a religious group in calling the Borough their private domain. (*Id.* at 61:17-20.) Residents commented that they were opposed to the creation of a "community within a community," because of the perceived attendant

social evils that would result. (*Id.* at 77:15-19.) As one resident said, "I do not want to live in someone else's domain, also known as a ghetto." (*Id.* at 77:21-23.)

Some residents felt that the *eruv* was "like a hostile take-over" of the community, in which the Borough should not assist. (*Id.* at 44:17-18.) Others thought it would lead to a demise of the public schools, which the Borough should not facilitate. (*Id.* at 47:1-9.) It was also expressed that residents liked the town the way it is, and did not want to visit the change wrought by an *eruv* upon it. (*Id.* at 52:10-12.)

It was also questioned why the town should give up a portion of its right-of-way to help ease restrictions that a religion had imposed upon itself. (*Id.* at 60:21-23.) Still others pointed out that the *eruv* supporters were limited by their faith itself, and that the town was not responsible for their burden. (*Id.* at 64:24-65:7.) If they wanted to, they could live in a town that had decided to accommodate them, as opposed to forcing accommodation upon Tenafly. (*Id.*) One seemed to frame the proponents' view clearly when he said "it would seem to me that if the opportunity arises for the town to offer me a convenience which I appreciate, which others appreciate, which is not at the detriment" of anyone else, the town should do so. (*Id.* at 76:9-17.)

In the face of this harsh criticism, many citizens were strongly in favor of the *eruv*. It was felt by some that the speakers against the *eruv* simply wanted to keep an influx of Orthodox Jews out of Tenafly. (*Id.* at 80:15-17.) Some saw the *eruv* as a harmless measure to increase diversity, the denial of which would inevitably and unfortunately lead to litigation. (*Id.* at 45:18-23.) Others felt it was a reasonable accommodation, which would increase diversity or improve their quality of life. (*Id.* at 48:1-2, 51:6-11, 64:1-14.) Some speakers sought to dispel the misconception that an

*eruv* would lead to stores closing on Saturday or to a demise of the public schools. (*Id.* at 56:11-57:13.) Others pointed out that it was not an infringement on any other residents of Tenafly, and that it was a concession to religious freedom that would harm no one. (*Id.* at 63:17-19, 71:15-23.) It was also noted that doing something which would make more affluent people want to live in Tenafly would be good for the town, since it would improve the real estate market. (*Id.* at 69:10-14.) Finally, there was an Englewood resident who spoke on behalf of the *eruv,* not because he wished to move to Tenafly, but because an *eruv* would make it easier for him to walk into Tenafly to see his friends on the Sabbath. (*Id.* at 100:13-23.)

Some residents did not speak out for or against the *eruv,* but instead asked questions they hoped might be answered, or sought to make neutral points. For instance, one resident asked how long the proponents of the *eruv* had lived in Tenafly, and wanted to know how they had gotten along without an *eruv.* (*Id.* at 52:21-53:2.) Another commented that if the matter were so important, it should be put on the ballot for a public vote. (*Id.* at 62:11-14.)

The December 12, 2000 hearing was in many respects identical to the one that took place on November 28, 2000. Mr. Book was given a chance to make introductory remarks, and closing remarks. (12/12/00 Tr. at 16:13-20:10.) The largest distinction at this hearing was that in addition to members of the public, members of various organizations were also present. This included the leaders of several local Christian churches.

Mr. Book had invited Rabbi Howard Jachter, of the Torah Academy of Bergen County, to speak to the group in greater detail about the nature of an *eruv,* and what impact it might have on the community. (12/12/00 Tr. at 20:24-34:1.) Rabbi Jachter also gave a history of the *eruv* movement in the United States (which began in the 1970's), and discussed many of the places in the United States that had eruvs. (*Id.*) He noted that in Washington D.C., even the Supreme Court of the United States sits within an *eruv.* (*Id.* at 27:3-4.) Most importantly, he tried to dispel some of the perceived misconceptions that existed about the nature of the religious domain created by the *eruv.* (*Id.* at 30:11-31:22.)

The Regional Director of the Anti Defamation League also spoke, and noted that while he would not want any religious symbol permanently placed on public property, the *eruv* was not a religious symbol but instead a reasonable accommodation of religion. (*Id.* at 43:17-22, 44:1-4.) He reiterated the precedent of *Long Branch* and concluded that it "is a secular accommodation for people to engage in secular activities, not religious activities." (*Id.* at 45:5-7.)

The comments made by the public at the second hearing were similar to those made on November 28th. For example, there was fear that approving the *eruv* would result in a pandora's box effect, whereby the town would have to grant all private religious requests to use public property. (*Id.* at 35:24-25.) Others pointed out that it would not be anti-Semitic to vote against the *eruv,* but would instead be a political decision about property rights. (*Id.* at 38:1-3.) One noted that the radical change that the *eruv* would bring would tarnish the community of Tenafly that all had enjoyed. (*Id.* at 51:9-15.) Another statement was made to the effect that it was the all-encompassing nature of the *eruv* that many persons, including secular Jews, found antithetical to Jewish heritage. (*Id.* at 90:14-18.) It was noted that the *eruv* "is a thorn in the side of the community of Tenafly and I think it will become a fester-

ing wound in the community of Tenafly." (*Id.* at 108:14-17.) One resident commented, "I hope your Mayor and your Council have the courage" to vote against the small group of people who sought to install an *eruv* and ruin the community." (*Id.* at 79:14-18.)

There were also numerous individuals at the second hearing who spoke out in favor of an *eruv* in Tenafly. For example, one noted that "surely, a town that brandished orange ribbons tied to almost every pole in town for what I think was several years can tolerate some unobtrusive markers that facilitate a better life for a segment of the community." (*Id.* at 52:11-16.) Another said, "I can see no downside to the erection of the *Eruv* at all. I do see that the Tenafly *Eruv* Association made a grave faux pas in attempting to erect the *Eruv* without permission." (*Id.* at 86:4-7.)

At the conclusion of the December 12, 2000 hearing, Mr. Book was again given the opportunity to make closing remarks. During these remarks, he again extolled the virtue of an *eruv*, and its importance to those who believed in it. (*Id.* at 110:23-119:3.) He also again mentioned an *eruv's* permissibility under the Establishment Clause, by commenting on *ACLU v. Long Branch.*

At the conclusion of the December 12, 2000 hearing, the Tenafly Borough Council voted 5-0 to deny TEAI's application. (Chaim Book Cert. ¶ 47; 12/12/00 Tr. at 126:4-15.) There was no written resolution memorializing the decision. Council Member Christian Yegen was not present,[16] and Mayor Moscovitz did not vote.[17] (*Id.*) Only Council members Kerge and Sullivan made any statements on the record regarding why they had voted as they did. (*See* Section I(D) of this Opinion, *infra.*)

The following day, December 13, 2000, the Borough, via a letter sent by its Counsel, ordered that Cablevision take action to remove the *eruv* material as soon as possible. (12/13/00 Letter from the Borough to Cablevision, Pls.' Ex. 13.) The Mayor also called Cablevision on December 13, 2000 and directly asked that the *Lechis* be removed as soon as possible. (Moscovitz Tr. at 103:19.)

This litigation commenced on December 15, 2000. Pursuant to the Court's temporary restraint entered that day and a series of consent orders extending it, the *eruv* has remained up pending resolution of this application for a preliminary injunction.[18]

### D. *The Borough Council's Grounds for Denying the Eruv Application*

Because only Councilman Sullivan (and to a much lesser extent Councilwoman Kerge) expressed any rationale for the Council's denial of the *eruv* at the December 12, 2000 hearing, the Court must rely primarily on statements made by the Council in their affidavits and during their testimony before the Court. To a lesser extent, statements made by some of the Council members at the two work sessions shed some light on the object of their

---

**16.** Councilman Yegen was present at the first hearing, but not at the second and did not vote. Council members Lipson and Wilson were absent from the first hearing but, after reviewing the tapes and transcripts, attended the second hearing and voted on the proposal to remove the *eruv*.

**17.** Tenafly has a weak Mayor and Council form of government, whereby the Mayor generally only votes in the case of a tie. (Moscovitz Tr. at 70:2-5.)

**18.** The *eruv* was down briefly during the pendency of this litigation because of acts of vandalism. The Court finds that the town responded properly to those acts of vandalism (by ordering heightened police patrols of the *eruv*), and has acted appropriately to ensure that such vandalism does not recur.

decisions. Although she did not vote, because the Mayor was an active participant in the events surrounding the Borough's denial of the *eruv* application, her expressed opinions on the *eruv* application are set forth here.

During their testimony before the Court, all of the Council members testified that they were not influenced by anti-Semitism or anti-Orthodox sentiments when they voted against the *eruv* application. (Wilson Tr. 62:20-63:1; Peck Tr. 90:19-23; Lipson Tr. 7:7-11; Kerge Tr. 41:20-24; Sullivan Tr. 6:2-6.) Beyond that common ground, all of the Defendants articulated somewhat differing reasons for their denial of the *eruv* application.

### 1. *Councilman Charles Lipson*

Councilman Lipson expressed four separate concerns that led to his denial of the application for the *eruv*. First, echoing what is a popular theme among some Council members, he believes that the construction of an *eruv* would create a "community within a community." (Lipson Aff. ¶ 9.) He believes that the *eruv* would establish a separation within the town of Tenafly, between those who are within the *eruv* and those who are outside of it. (Lipson Tr. at 23:20-24.) This would be very disruptive for the town. (Lipson Aff. ¶ 10.) Further, Councilman Lipson believes that the anger and strife within a town that a "community within a community" would create is evident from the tone of the papers filed in this case. (*Id.*)

The second concern voiced by Councilman Lipson had to do with control of the Borough's right-of-way. In his mind, although many religious groups could find a use of the Tenafly right-of-way for their purposes, Tenafly strictly limits use of the right-of-way. (*Id.* ¶ 11.) Exceptions to the no-use policy are only allowed after a detailed application is made to the Council,

and after a determination is made that the exception would be "good for the town." (*Id.*) The Councilman is concerned that if an *eruv* is permitted, the town will not be able to say no to future requests by other private actors for both religious and non-religious use of the right-of-way. (*Id.*) In effect, he did not want to set a precedent that would cause the town to lose control of the right-of-way. (*Id.*)

Mr. Lipson's third concern had to do with his obligation to Tenafly and to his constituents. Despite the many "obnoxious" statements that were made by the public against the *eruv*, what affected the Councilman most came from within:

> [w]hat affected me most is my own experience and knowledge and my understanding of the Borough of Tenafly, the way it is and the way I want it to be. I believe that in voting against the *eruv* I was doing what I was elected to do: be concerned with the best interests of the residents of the Borough, all of them, and, in addition, voting my conscience. I stand by my vote.

(Lipson Aff. ¶ 11.)

The fourth concern held by the Councilman, which he expressed only during his testimony before this Court, was that the *eruv* should be denied because it had been erected illegally. He reached this conclusion even though he was aware that his decision would have an impact on whether *eruv*-observant Jews would move to Tenafly. (Lipson Tr. at 24:5-23, 28:5-10.)

### 2. *Councilwoman Martha Kerge*

As an initial matter, Ms. Kerge was quite concerned about letting the public express their opinions on the *eruv*. At the November 21, 2000 work session, when it became necessary to schedule the meeting for two days because of Council attendance problems, she stated that "if it's a continu-

ation they can still speak again. We can not bridle the voice of the public." (11/21/00 Tr. at 11.) In keeping with this, Ms. Kerge spoke to many citizens and heard from many people with strong feelings on both sides of the *eruv* issue. (Kerge Aff. ¶ 6.) Prior to her vote on December 12, 2000, she again expressed the importance of considering all points of view, and stated that she was voting as she did because based on all she had heard and read, it would be in the best interest of Tenafly to deny the *eruv*. (12/12/00 Tr. at 120:25-121:13.)

The Councilwoman's primary objection to the *eruv* seemed to stem from a desire to avoid an entanglement with religion, while simultaneously rejecting a request she deemed unnecessary. After noting Plaintiffs' constitutional right to practice their religion, and the welcoming nature of Tenafly to all people and faiths, she stated:

[i]t is my belief that all the different religions do worship freely and practice their religion freely. It is my further understanding that Orthodox congregations can and do practice their religion freely without the accommodation of an *eruv* and that a town may establish an *eruv* or may deny and *eruv*. No one ever told me a town must establish an *eruv*.

(Kerge Aff. ¶ 7.)

While Ms. Kerge did concede that *eruv* supporters would like to have an *eruv*, she did not think it was required for them to practice their faith. (Test. of Martha B. Kerge, May 1, 2001 ("Kerge Tr.") at 49:20-23.) Councilwoman Kerge viewed an *eruv* as an accommodation, the absence of which did not hinder the free practice of religion by Orthodox Jews. (Kerge Aff. ¶ 8.) Essentially, Ms. Kerge felt the government is typically not required to create a special accommodation for the practice of religion by a specific religious sect, and that the *eruv* falls into that category. (*Id.* ¶ 13.) She

believed the Tenafly Orthodox community would continue to thrive without an *eruv*. (*Id.* ¶ 14.) She pointed to the Orthodox Jews who currently live in Tenafly without an *eruv* to support the proposition that an *eruv* is not essential, and is instead only an accommodation. (Kerge Tr. at 57:14-20.)

Since she did not view the *eruv* as a required accommodation, Ms. Kerge wanted to avoid specially benefitting any group, and impinging on the rights of others. (Kerge Aff. ¶ 12.) These concerns of impinging the right of others arose with concerns about not being able to opt out of the *eruv*. On that point, she said, "I believe that this accommodation would affect the rights of those who do not want to live within an *eruv*. I do not want to vote to establish something that makes people within an *eruv* feel awkward or put upon by a symbol of a religious group." (*Id.*)

In passing, Councilwoman Kerge expressed the same concern about building a "community within a community" that was expressed by Councilman Lipson. She believed such a community poses serious questions for Tenafly. (*Id.* ¶ 9.) She also implied that the *eruv* might be divisive when she described the *eruv's* symbolic meaning. She noted that while the *eruv* has symbolic meaning which might not apply to one person, it could apply either positively or negatively to the rest of the people in Tenafly. (Kerge Tr. at 62:10-13.)

Ms. Kerge also expressed brief concerns about an *eruv's* impact on Tenafly's control of its right-of-way. She felt that given the strictures imposed upon the Tenafly right-of-way, which limit even for-sale signs, "the right-of-way should remain free of encumbrances. They should not be used for symbolic or religious or accommodation purposes for any group." (*Id.* ¶ 11.)

### 3. *Councilman Richard Wilson*

Councilman Wilson had two distinct concerns about the *eruv*. First, he found the

permanent nature of the *eruv* to be its most ominous aspect. (Wilson Aff. ¶ 7.) He was of the belief that the permanent *eruv* is in sharp contrast to other religious symbols which exist in Tenafly (such as the Menorah in Borough Park), which are temporarily erected on Borough property during the holidays. (*Id.*) Similar to the concern of Councilman Lipson, Mr. Wilson felt that the permanence of the *eruv* might make it impossible for the Borough to reverse its decision in the future, if the *eruv* were allowed. (*Id.*) He did not wish to permit a religious symbol of a "permanent" nature in the public right-of-way. (Test. of Richard V. Wilson, April 30, 2001 ("Wilson Tr.") at 84:10-12.)

The second concern expressed by the Councilman was that after giving "due consideration" to the various points presented, based on his own knowledge of medieval history, he believed an *eruv* would lead to the creation of a "ghetto" in Tenafly. (Wilson Aff. ¶¶ 2-4; Wilson Tr. at 69:25.) Avoiding the creation of the ghetto formed a basis for his vote. (Wilson Tr. at 70:3.)

Essentially, "the community of Tenafly would be at great risk and would encourage the creation of what has become in recent history a symbol of the restriction of religious freedom if an *eruv* is erected." (Wilson Aff. ¶ 5.) He had been told that the "risk" and "restriction" came from demarcating an area symbolically within which non-Orthodox Jews might feel less Jewish or feel like "the wrong type of Jewish person." (Wilson Tr. at 87:20-88:3.) Councilman Wilson took this sentiment into consideration when voting. (Wilson Tr. at 88:4-5.) In further explaining what he meant by a "ghetto," Councilman Wilson stated that this restriction leads to everyone in a particular neighborhood being of an Orthodox sect, which is generally considered the definition of a "ghetto." (Wilson Tr. at 88:5-9.)

Another part of this anti-ghetto motivation stemmed from a desire to avoid what had happened in other areas:

> [W]e find ... in modern times that when you create a neighborhood through the use of this religious symbol, however its physical characteristics may be, there is a tendency over the years to then have only people of that particular Orthodox Jewish faith to live in that neighborhood.

(Wilson Tr. at 78:11-22.)

Councilman Wilson's fear was that "an *eruv* in Tenafly would be divisive and detrimental to the town." (Wilson Aff. ¶ 9.) In order to keep this from happening, he stated "I believe that, in my role as Council member, I should vote for what I believe is in the best interest of the Borough of Tenafly and that is why I voted against the application." (*Id.*)

Even though Mr. Wilson believed an *eruv* to be divisive, he acknowledged that since its erection it has not interfered with his daily living or his practice of religion at all. (Wilson Tr. at 65:21, 66:4.) He further commented that the divisiveness of an *eruv* would be most apparent between Orthodox and Reform Jews, and that Christians would be less affected. (Wilson Tr. at 88:24-89:8.) He held this opinion because in his mind, an *eruv* has very restrictive religious symbolism to those Jewish residents of Tenafly who do not believe that it allows them to push and carry on the Sabbath. (Wilson Tr. at 68:16-25.) He believes that to those Jews, the *eruv* designates or restricts an area only for the use of the Orthodox community's Sabbath. (*Id.*) He also understands that it implies to those Jews that they are somehow not truly Jewish. (Wilson Tr. at 69:8-12.)

### 4. *Councilman Arthur Peck*

Councilman Peck expressed several reasons for voting against the *eruv* applica-

tion. First, he felt that it was unacceptable to have an *eruv* which had been erected without permission on poles in the Borough's right-of-way. (Peck Aff. ¶ 2.) In his words, to allow the *eruv* to remain and "[t]o fail to enforce local law would be to violate the oath Tenafly officials take when sworn into office." (*Id.*) Concerned that permanent use of public property for a religious purpose would establish a precedent for such use in the future, he voted to deny the *eruv*. (*Id.* ¶ 3.)

Mr. Peck also had apparent state establishment of religion concerns: he wanted a decision that would serve to avoid having to chose between competing religious requests in the future. (*Id.*) He also wished in part to avoid the appearance of an establishment clause violation, since civil authority permission for the *eruv* might represent an entanglement of church and state. (*Id.* ¶ 4; Peck Tr. at 100:19-23.)

A final argument raised by the Councilman seemed to be that the *eruv* is not a necessary religious accommodation. He reasoned that because local Orthodox Jews had lived in the town for five years and had never requested an *eruv*, it is likely not required for their faith now. (*Id.* ¶ 5.) Tied to this was his concern that since most *eruv* supporters live outside Tenafly, he had no major obligation to consider their requests, but instead had an obligation to his residents (presumably those who opposed it). (*Id.* ¶ 6.)

It seemed to Mr. Peck that the residents in Tenafly who now sought an *eruv* were already practicing their religion without an *eruv*. (Peck Tr. at 104:24-25.) Because they knew Tenafly did not have an *eruv* when they moved, and because they remained residents in Tenafly without it, denying permission for an *eruv* would not impact on an existing situation. (*Id.* at 105:3-7.) Denial of *eruv* would mean only that they would continue to live in Tenafly without

the benefits an *eruv* would provide. (*Id.* at 105:15-17.) Given the many surrounding communities that had eruvs, including neighboring Englewood, and that the supporters of an *eruv* could live in Englewood if they wanted, it did not seem to Councilman Peck that the impact of denying the *eruv* would be particularly severe. (*Id.* at 106:10-17.)

### 5. *Councilman John Sullivan*

Unlike the other Council members, Mr. Sullivan repeatedly expressed his views on the *eruv* during the public meetings that took place prior to the vote. At the November 21, 2000 work session, he commented that while he felt the members of the *eruv* association he had met should be welcomed into the Tenafly community, he was troubled by their request to "make the walls of Jerusalem tangible." (11/21/00 Tr. at 4.) By way of comparison, Councilman Sullivan also mentioned how troubling it would be if the town were dedicated to St. Francis of Assisi in the name of nature and peace, and demarcated with green and white streamers. (*Id.*) He felt that such conduct, which was similar to the *eruv*, would be advancing one person's religious beliefs ahead of another's. (*Id.*) He also implied that Plaintiffs were an "outside pressure group" who had come to Tenafly and were now trying to tell the town how to conduct its affairs. (*Id.* at 4-5.)

Shortly before the vote on December 12, 2000, Councilman Sullivan also made a number of comments on the record as to why he was about to vote against the *eruv*. (12/12/00 Tr. at 121:21-125:6.) Essentially, his concern was that private use would be made of the Borough right-of-way by a religious group, which could lead to undesirable precedent if future groups made similar requests. (*Id.*) He was also troubled that an *eruv* would establish a private

domain on public land, from which no one could opt out. (*Id.*)

These concerns are repeated in the statements made by Mr. Sullivan after the vote. According to the Councilman, he concluded from his review of scholarly works that since an *eruv* designates the public domain as a religious extension of the home's private domain, the creation of one in Tenafly would contravene the rights of Tenafly's residents to free association without religious and governmental interference. (Sullivan Aff. ¶ 4.) This entanglement/endorsement issue seemed to be central to Councilman Sullivan. His vote took into account the fact that there was no opt-out procedure for citizens whose homes were within the "religious domain" of the *eruv*. (*Id.* ¶ 6.) Similarly, He did not think it was appropriate that the *eruv* would be established in a way that would involve both the government and a religious entity, and thought the Borough should stay clear of the issue. (Sullivan Tr. at 9:16-23.)

The last establishment-related reason for his vote against the *eruv* was a concern about his constituents' interests. Noting that Tenafly is an ecumenical town, Mr. Sullivan "believe[s] that we as citizens can help each other rather than permit government to dictate how we practice religion through fiat." (*Id.* ¶ 8.) He felt that by permitting an *eruv*, he might be interfering with his constituents who were opposed to the *eruv*. (Sullivan Tr. at 11:11-13.) Accordingly, he wished to avoid creation of a private, religious domain within the public domain. (*Id.* at 14:1-6.) He felt he had to represent his constituents who had objected to it, as well as members of the *Eruv* Association. (*Id.* at 24:11-13.) Councilman Sullivan did concede that the absence of an *eruv* would adversely impact the lives of those who believed in it. (*Id.* at 16:24.)

Distinct from his Establishment Clause concerns, Councilman Sullivan's decision was also influenced by TEAI's failure to find harmony and compromising by seeking to establish an *eruv* with natural boundaries. (Sullivan Aff. ¶ 7.) While he would not have been opposed to such an *eruv*, he had a problem with any *eruv* created on municipal property. (Sullivan Tr. at 22:7-23:10.)

### 6. *Mayor Ann Moscovitz*

Mayor Moscovitz's primary concern with the *eruv* was "a constitutional one, a legal one, and that is that municipal property is not to be used for any private or religious purpose of a permanent nature." (Moscovitz Tr. at 71:1-3.) The Mayor stated that in her position as Mayor, she attempts to "do what I think is best for the people of Tenafly." (Moscovitz Aff. ¶ 21.) With that guidance in mind, she has expressed an intention to continue to follow her oath of office and do what she thinks is best for Tenafly regardless of her personal religious beliefs. (*Id.* ¶ 22.) She refused to succumb to pressure to accommodate her fellow Jews on the basis of religion alone. "Because we are Jewish, they assume, and seem to demand, that we set aside our thought process in coming to a decision about what is best for the town, and that we should do what they want just because we are Jewish." (*Id.*) That having been said, she "listened to a lot of bad things" at the public hearings, and did not necessarily agree with everything that was said. (Moscovitz Tr. at 95:24-25.)

### E. *The Borough's Control of its Right-of-Way*

While the utility poles Plaintiffs sought access to are owned by Verizon and not the Borough, they reside in the Borough's right-of-way. (DiGiacomo Tr. at 48:10-14.) As such, the "municipal poles are on town

property and municipal approval is necessary." (Moscovitz Aff. ¶ 18.) It is undisputed that the Borough's control of the poles comes not from ownership of them, but instead from the poles' location in the municipal right-of-way. (*See, e.g.,* Tenafly Ordinance No. 1127.)

That the Borough relies on its ownership of the right-of-way to control uses within the right-of-way is further demonstrated by a "Right of Way Use Agreement," entered into between the Borough and Metricom, a wireless telecommunications provider. (Agreement attached to Shapiro First Suppl. Cert. as Ex. A.) That agreement grants Metricom the right to enter the right-of-way to attach its telecommunications devices onto third-party property (namely the poles), but restricts any placement on third-party property to those placements which are expressly permitted by the owner(s) of the affected property. (*Id.* at § 3.1.)

The Borough of Tenafly claims that it tightly regulates all private use of its public right-of-way, including its utility poles, by local ordinances. (DiGiacomo Tr. at 17:14-22.) This control is demonstrated in part by the previously detailed Ordinance 691, and by a sign ordinance, which prohibits the posting of all signage on utility poles. (*Id.* at 17:20-22.) Tenafly further controls the right-of-way via a garage sale ordinance, which requires residents to use town supplied signs, and restricts the placement of the signs to private property. (Ordinance attached to DiGiacomo Second Aff. as Ex. A.)

Not all uses of the right-of-way are banned. The Borough has stipulated that it has not denied an application to place a sprinkler system in the public right-of-way for at least fourteen years. (DiGiacomo Tr. at 43:18.) The Borough has also allowed assorted variances for walls, light-posts, and fences. (*e.g.* Pls.' Exs. 3,8-11.)

Unlike those landscaping applications, however, there have been "many" denials of applications to place signs in the right-of-way. (4/30/01 Tr. at 44:45.) While signs are occasionally permitted to be placed in the public right-of-way, they are allowed only after application is made to the Borough and only in accordance with the sign ordinance. (*See, e.g.,* Pls.' Ex. 7 (Tenafly Agreement with the Villa Cortina, allowing commercial sign to be placed in right-of-way for $1.00).)

Even though the Borough claims to have a strictly enforced no-private-use policy for its right-of-way, Plaintiffs argue to the contrary. To support the contention that Tenafly does not tightly control its right-of-way, Plaintiffs submitted pictures of assorted privately posted signs and numbers (signs such as house numbers, lost dog notices, etc.) on utility poles. (Pls.' Exs. 21-31.) The Borough allegedly responded to those pictures by making a concerted effort to have the signs removed from the poles. (DiGiacomo Tr. at 48:23-50:13.) Plaintiffs contend that Defendants' effort was not in fact thorough, since after the Borough made its effort to remove the signs, a number of the same signs shown in the exhibits remained on the poles.

In addition to the non-permitted uses which the town seeks to bar, there are a handful of private uses of the right-of-way which the town permits, even though they are not contemplated by ordinance. First, Plaintiffs photographed at least five privately placed church directional signs, two of which are in the Borough right-of-way. (Nelkin Aff. ¶ 3; DiGiacomo Tr. at 28:20-29:2; DiGiacomo Second Aff. ¶ 6.) The remainder are in the county right-of-way. (DiGiacomo Third Aff. ¶ 2.) Some of these church directional signs contain religious symbols. (DiGiacomo Tr. at 29:7.) Although no application was made for these signs, the Borough tacitly permitted their exis-

tence in the right-of-way. (*Id.*) Even absent a provision in the Borough ordinances allowing these signs, the Borough permitted them to remain because they served the purpose of providing motorists with directions to the religious institutions that had placed the signs. (*Id.* at 29:8-16; DiGiacomo Second Aff. ¶ 6.)

While Defendants initially contested that the signs photographed by Plaintiffs were located in the municipal right-of-way, and were instead located along county roads (thus placing them in the county right-of-way), Defendants admit that at least two of the signs are in the Borough right-of-way. (DiGiacomo Third Aff. ¶ 2.) One such directional sign, attached to a traffic sign, is located in the municipal right-of-way at the northwest corner of Engle Street and East Clinton Avenue in Tenafly. (*Id.* ¶ 2(b).) This sign, shown in the photograph attached to Borough Administrator DiGiacomo's third affidavit as Exhibit B, reads "Greek Orthodox Church ← 1 Mile," and contains the image of a stylized Greek Orthodox cross. The sign is mounted on the same pole as a municipal directional sign, which graphically illustrates "left lane--left turn only; right lane--right turn or straight." (*Id.*)

The other church directional sign now before the Court which is located in the Borough right-of-way is located on Engle Street, at the intersection with Hillside Avenue. (DiGiacomo Third Aff. ¶ 2(c).) This sign, shown in the photograph attached to DiGiacomo's third affidavit as Exhibit C, reads "Presbyterian Church (USA) 2 Blocks ←," and also contains a stylized cross. (*Id.*)

After a review of the directional signs mentioned above, (both those on municipal property and those on County property within Tenafly), the Mayor and Council ordered that the Borough Attorney contact the churches responsible for the signs.

(5/24/01 Letter from Lesnevich to the Court.) The churches were informed that any signs which contained religious symbols or hours of religious services would need to be removed. (*Id.*) The churches were permitted to replace the signs with purely directional markers, that contained only the name of the house of worship and directional information. (*Id.*) As of July 18, 2001 however, the original signs were still standing in the right-of-way, apparently unchanged. (*See* Nelkin Suppl. Aff. ¶ 3.)

Plaintiffs also presented another use of the municipal right-of-way which is not permitted by Ordinance, but is allowed to continue by the Borough Council. Specifically, each year holiday displays are placed on utility poles by the Tenafly Chamber of Commerce. (*See, e.g.,* Nelkin Aff. Ex. B.) These holiday displays consist of a wreath, garland, light fixture, and seasonal holiday lights. (*Id.*) The Court has attached a photograph of these holiday displays to this Opinion as Appendix C. According to Borough Administrator DiGiacomo:

> The holiday decorations placed on utility poles are paid for by local businesses. This is done through the Chamber of Commerce. The purpose is to promote a shopping atmosphere in downtown during the holiday season. They remain in place for approximately six weeks. They are intended to be nondenominational and are certainly nonreligious. They are intended to convey a wintry holiday theme and nothing else.

(DiGiacomo Second Aff. ¶ 4.)

After a review of all the evidence submitted which bears on Tenafly's right-of-way, notwithstanding the holiday displays and the pair of church directional signs in the Borough right-of-way, the Court finds that the Borough did have a policy of controlling access to its utility poles and municipal rights-of-way, generally allowing access only in those circumstances where a

use was permitted under a municipal ordinance.[19]

## II. DISCUSSION

■ Since a motion for a preliminary injunction cannot be granted unless the movant demonstrates a reasonable likelihood of success on the merits, *see Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir.2000), it is the merits that demand immediate attention. Plaintiffs argue that the decision of the Borough Council to deny permission to attach the *lechis* to the utility poles violated their rights under the First Amendment to the Constitution, as applied to the states through the Fourteenth Amendment of the Constitution. *See Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Specifically, they argue that the Borough Council intentionally discriminated against the Free Exercise of their religion, and furthermore violated their Right to Free Expression by engaging in viewpoint discrimination when it denied their application on the basis of the *eruv's* symbolic message.[20]

Plaintiffs cannot understand how their request to attach rubber strips to utility poles could be denied when the Borough permits religious uses of its municipal property in general; for example, the placement of a creche and a menorah in a public park, a visit with Santa Claus in Borough Hall, an easter egg roll on the Borough Hall lawn, or an annual three-hour Good Friday march through the center of town with police traffic control. Given these uses, Plaintiffs find the Borough's decision to be unconstitutionally discriminatory, especially because the *lechis* themselves in no way interfere with safety or aesthetics, and because the municipality tolerates other uses of its municipal right-of-way, such as the placement of directional signs of several Christian churches, which contain Christian symbols, or private non-religious uses such as sprinkler systems installed by contiguous property owners. With respect to the utility poles themselves, Plaintiffs note that they are used for annual holiday displays, and have been used in the past by citizens for the placement of ribbons to signify solidarity against a proposed regionalization of the school system.

In further support of their contention that the Borough Council's decision was animated by religious discrimination, Plaintiffs point to statements by the public and by some members of the Borough Council to the effect that an *eruv* would encourage Orthodox Jews to move to Tenafly, creating a community within a community and creating divisiveness in an otherwise open and tolerant town. Plaintiffs can find no rational reason for the Council's decision, particularly in light of the fact that two courts have concluded that by permitting an *eruv* on public property, a municipality does not violate the Establish-

---

**19.** Limited references were made at the public hearings and in argument before the Court to orange ribbons which at some point in the past were tied around trees and utility poles in Tenafly to symbolize community solidarity against regionalization of the public school system. The Court does not have before it sufficient evidence to include them in its analysis, since it has not been made aware of how prevalent these ribbons were, where exactly they were located, how long they remained in place, whether the Borough Council was aware of them, or what efforts (if any) were made to remove them.

**20.** The Court notes that Plaintiffs' Complaint does not assert a violation of the Equal Protection Clause of the Fourteenth Amendment, and notes that any potential violation of the Equal Protection Clause has not been briefed. Accordingly, the Court will not address the question of whether the Borough Council violated Plaintiffs' Equal Protection rights when it denied Plaintiffs' application to hang the *lechis*.

ment Clause. *See ACLU of New Jersey v. City of Long Branch,* 670 F.Supp. 1293 (D.N.J.1987); *Smith v. Community Bd. No. 14,* 128 Misc.2d 944, 491 N.Y.S.2d 584 (N.Y.Sup.1985), *aff'd.* 133 A.D.2d 79, 518 N.Y.S.2d 356 (N.Y.App, Div.1987).

The Borough responds that its decision to deny access to the public right-of-way, and by extension to deny use of the utility poles, was constitutional. It argues that Tenafly Ordinance 691, which prohibits placing "any sign or advertisement, or other matter upon any pole," allows only for uses of the right-of-way that are expressly contemplated by municipal ordinance, and that the only use of the right-of-way not contemplated by ordinance that the Borough regularly permits is the Chamber of Commerce holiday displays. The Borough points out that the Orthodox Jews were not singled out for discriminatory treatment, since Ordinance 691 long predated the application by the Tenafly Eruv Association.

As to the use of the right-of-way for church directional signs, the Borough responds that the signs serve a purely directional purpose, and in any event the churches have been requested to remove any religious symbols from the signs. Since the other uses of municipal property by religious organizations do not occur in the right-of-way, the Borough contends that a different mode of analysis must be applied, and that constitutional jurisprudence permits, if not mandates, municipal acquiescence to those uses.

The Borough further argues that the case law relied on by Plaintiffs, while permitting an *eruv* on public property, does not mandate the grant of permission for it. In light of the neutral language of Ordinance 691, and concerns of citizens that public property should not be dedicated on

a permanent basis for use by one religious organization, the Borough believes "the eruv decision was a classic case of the legislative weighing of the enhancing benefits to some citizens against the symbolic harms associated with delineating and renting public space to a sub-group of citizens." (Defs.' Mem. of Law Surreply to Pls.' Application for a Preliminary Injunction, at 15-16.)

Did the Borough Council of the Borough of Tenafly violate the rights of Plaintiffs as protected by the First Amendment when it denied their request to access the municipal right-of-way to attach *lechis* to Verizon's utility poles? The Court finds it to be a complex question with no easy answer, both because of the factual circumstances underlying the Council's action and because of First Amendment jurisprudence itself--confusing to the judge and scholar, and impenetrable to the layman. As Justice Scalia observed "the Court's religion-clause jurisprudence ... has been described by scholars of all persuasions, and even by the justices themselves, as unprincipled, incoherent, and unworkable." [21] Be that as it may, Plaintiffs' application for a preliminary injunction must be decided. Aware that this Court will in all likelihood not have the last word, the Court will first take up Plaintiffs' Free Expression claim.

A. *Free Expression*

The facts of this case do not fit into a neat constitutional category. Before any determination can be made as to whether Plaintiffs' rights were violated, the Court must first determine how the *lechis* themselves should be classified. Plaintiffs argue that the *lechis* and the *eruv* have expressive value to those Orthodox Jews who are *eruv*-observant, and that to preclude placement of the *lechis* on the utility poles because of the message they convey consti-

**21.** Antonin Scalia, *A Matter of Interpretation* 109 (1998).

tutes viewpoint discrimination prohibited by the First Amendment. Essentially, Plaintiffs argue that by refusing permission to place the *lechis* on the utility poles and thereby blocking the construction of an *eruv*, the Council has discriminated against them on the basis of the particular religious message they seek to express.

■■■ Although Defendants contend that the *lechis* constitute conduct and not speech, and therefore raise no Free Expression issues, this distinction between speech and conduct is not necessarily meaningful. The Court concludes that in light of *Spence v. Washington*, the *lechis* are properly classified as symbolic speech: they are intended to convey a particular message and in the context and the surrounding circumstances in which they are used, the message will be understood by those who view them. *Spence v. Washington*, 418 U.S. 405, 410-411, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)(holding that display of U.S. flag upside down with a peace symbol attached on both sides coinciding with Cambodian incursion and Kent State tragedy constituted speech); *see also Tinker v. Des Moines Indep. Comm. School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)(wearing of black armband constituted symbolic act protected by free speech clause). That the symbolic speech is also religious exercise is not relevant; the Free Speech Clause not only protects secular private speech but also private religious expression. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 759, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).

■■ Of course, just because Plaintiffs wish to use the utility poles for otherwise protectable expression does not automatically entitle them to do so. The First Amendment does not guarantee access to property for expression just because it is owned or controlled by the government.

*United States Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 130, 101 S.Ct. 2676, 69 L.Ed.2d 517, n. 6 (1981). The mere fact that the state cannot suppress speech in public places does not mean that the state must guarantee a forum on all property that it owns. *Pinette*, 515 U.S. at 761, 115 S.Ct. 2440. "Nothing in the Constitution requires the government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property." *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 799-800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

Because the Government can impose access restrictions of varying degrees based on the nature of the property in question, a determination of when the Borough of Tenafly must permit Plaintiffs access to its property, when it may permit access, and when it need not permit access for expressive purposes requires the Court to determine how the utility poles and the right-of-way should be categorized. To determine what access restrictions are appropriate for particular property, the Supreme Court has adopted a forum analysis consisting of three categories of forum: the public forum, the designated (or limited public forum), and the nonpublic forum. *See Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45-46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

■■ Streets, parks, or a town square are typical public forums, because they have traditionally been used for public discourse and debate. In a public forum, absent a compelling interest the state may not prohibit expression, but may place reasonable restrictions only on the time, place and manner of that expression. *Id.* at 44, 103 S.Ct. 948; *Pinette*, 515 U.S. at 761, 115 S.Ct. 2440.

The second category of forum, a limited or designated public forum, is created when the state, although not required to do so, opens public property for expressive purposes. This property is necessarily of a type that is not traditionally open to the public for expression. *Perry,* 460 U.S. at 45, 103 S.Ct. 948. Examples of such a forum would be university meeting facilities, a school board meeting, or a municipal theater. *See respectively Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *City of Madison Joint School Dist. v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). The same standards apply to a limited or designated public forum as apply to a traditional public forum: while the state cannot prohibit all communicative activity, reasonable time, place and manner regulations pass constitutional muster; as do content-based prohibitions drawn narrowly to effectuate a compelling state interest.

A different standard applies to public property that is not by tradition or designation a forum for public communication. It is this third category, the nonpublic forum, that commands the Court's attention in this case.

Rights-of-way and utility poles are certainly not traditional forums to which the public has had open access for discourse. While the Supreme Court has noted that "[l]ampposts can of course be used as signposts, ... the mere fact that government property can be used as a vehicle for communication does not mean that the Constitution requires such uses to be permitted." *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 814, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). In this case, there is no evidence that the Borough has ever allowed the utility poles or its right-of-way to be used by the public for unfettered discourse or debate.

It is true that with the Borough's express permission the poles have been used by the Chamber of Commerce for its holiday displays, and with the Borough's tacit consent the right-of-way is home to at least a pair of church directional signs, but those instances alone do not support a finding that the municipality has opened what is otherwise a nontraditional forum to the public for discourse. In any event, the mere fact that some private expression has occurred in a forum either as the result of government inaction or limited governmental permission does not open a nontraditional forum to the public for discourse. *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. Based on this, and in light of all the evidence, the Court concludes that the utility poles as well as the Borough's right-of-way are nonpublic forums.

In directing how municipal property should be classified for forum analysis purposes, the Supreme Court has counseled that in cases where limited access is sought, a Court should take a tailored approach to ascertaining the perimeters of the relevant forum within the confines of government property. *Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439. In *Perry,* for example, the relevant forum was not an entire school, but the internal mail system and mail boxes within that school to which the plaintiffs sought access. *See Perry* 460 U.S. at 46, 103 S.Ct. 948. In *Cornelius,* the relevant forum was not the Federal workplace, but the fund drive to which plaintiffs sought access. 473 U.S. at 801, 105 S.Ct. 3439. Based on this guidance, the Court concludes that since Plaintiffs seek access to the utility poles specifically, the utility poles are the relevant forum, as distinct from the entire municipal right-of-way.

■ The classification of the utility poles as a nonpublic forum has constitutional importance because access to nonpublic forums for expressive purposes can be more tightly restricted than access to public forums. "[C]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439. In *Cornelius,* the Supreme Court held that the Government did not violate the First Amendment when it excluded legal defense organizations from participating in a charity drive aimed at federal employees. After concluding that the charity drive in question was a nonpublic forum, the Supreme Court found reasonable the Government's decision to limit access in order to minimize disruption of the federal workplace, and to ensure success of the fund raising effort while avoiding the appearance of political favoritism.

■ Even in a nonpublic forum, however, the *Cornelius* Court found that the Government is not free to restrict speech in order to repress it. *See Pinette,* 515 U.S. at 762, 115 S.Ct. 2440; *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 390-95, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)(Regardless of the forum in question "[d]iscrimination against speech because of its message is presumed to be unconstitutional"). Restrictions must in all circumstances be " 'reasonable and ... not an effort to suppress expression merely because public officials oppose the speaker's view.' " *Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439 (1985)(*quoting Perry,* 460 U.S. at 46, 103 S.Ct. 948). Premised on this, the Supreme Court remanded *Corne-*

*lius* to determine whether the Government had impermissibly excluded organizations from the federal fund drive not on some reasonable basis, but because the Government disagreed with their points of view.

■ Viewpoint discrimination results if the government targets not only subject matter, but particular views taken by speakers on a subject. *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510. An example of viewpoint discrimination at work can be seen in the case of *Grossbaum v. Indianapolis-Marion County Building Authority ("Grossbaum I"),* 870 F.Supp. 1450 (S.D.Ind.1994). The underlying dispute in *Grossbaum I* spawned a number of subsequent decisions that are instructive with respect to the issues in this case. *See Grossbaum I,* 870 F.Supp. 1450, *rev'd. by Grossbaum v. Indianapolis Marion County Building Authority ("Grossbaum II"),* 63 F.3d 581 (7th Cir.1995), *on remand, Grossbaum v. Indianapolis-Marion County Building Authority ("Grossbaum III"),* 909 F.Supp. 1187 (S.D.Ind.1995), *aff'd. by Grossbaum v. Indianapolis-Marion County Building Authority ("Grossbaum IV"),* 100 F.3d 1287 (7th Cir.1996), *cert. den.,* 520 U.S. 1230, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997). The entire controversy began when Rabbi Grossbaum sought to compel the Indianapolis Building Authority to allow him to display a menorah in the lobby of the City-County building during Chanukah. Even though the city had erected a Christmas tree in the lobby, and allowed other uses of the lobby, it denied the Rabbi's request to set up a menorah.

The parties stipulated that the lobby in question was a nonpublic forum. The trial court initially denied relief, concluding that prohibiting the display of a menorah after permitting the secular display of a Christmas tree did not constitute viewpoint discrimination on the part of the Government. The Court of Appeals for the Seventh Cir-

cuit reversed, holding that so long as other organizations remained free to apply for space in the City-County building for non-religious messages, the Board could not prohibit display of the menorah solely because of the religious perspective of its message, without running afoul of the Free Expression Clause. *Grossbaum II*, 63 F.3d at 592.

■ Unlike the regulation in *Grossbaum* that facially imposed access restrictions on the basis of a speaker's religious point of view, on its face Tenafly Ordinance 691 does not differentiate based on anyone's viewpoint, let alone Plaintiffs'. Enacted in 1954, the ordinance does not regulate requests for access based on either content or message. Instead, it provides in relevant part:

> No person shall place any sign or advertisement, or other matter upon any pole, tree, curbstone, sidewalk or elsewhere, in any public street or public place, excepting such as may be authorized by this or any other ordinance of the Borough.

(Tenafly Ordinance 691 Article VIII(7)). In effect, Tenafly Ordinance 691 allows access only if it is expressly authorized by ordinance. Since no Tenafly ordinance authorizes the placement of signs or other non-utility matter upon utility poles in Tenafly, any such placements, including the *lechis* required to form the *eruv*, are presumptively barred by Tenafly Ordinance 691.

There is no evidence in the record that other religious organizations, private citizens, or commercial enterprises ever applied for permission to utilize the utility poles for expressive speech of any kind, be it religious, secular, or commercial speech. Indeed given the language of the ordinance, it would be difficult to see how the Borough could grant such permission, since Ordinance 691 does not provide for legislative discretion. In any event, there is

no evidence that the Borough ever granted an application for use of the utility poles that involved a use similar to the attachment of the *lechis*.

Tenafly Ordinance 691 predates Plaintiffs' request for access, and represents a reasonable effort to restrict municipal property to the use for which it has been lawfully dedicated (i.e. utility use only). By prohibiting "*any* sign or advertisement, or other matter upon any pole," it is neutral on its face. A decision enforcing such a neutral ordinance is immune from any constitutional infirmity on the ground that it constitutes viewpoint discrimination, so long as the facially neutral provision is not applied in a manner that has the effect of discriminating against Plaintiffs on the basis of the view they wish to express.

■ Plaintiffs argue that this is exactly what occurred, for in practice they assert that the Borough has discriminated against the *eruv*-observant viewpoint by denying their request, while allowing other private actors access to the right-of-way for expressive purposes, in violation of Tenafly Ordinance 691. They contend that but for the message conveyed by the *lechis* and the *eruv*, they would have been granted permission to engage in what amounts to an otherwise innocuous use of the utility poles.

Plaintiffs' argument rests first upon the Chamber of Commerce holiday displays. In his Affidavit Joseph DiGiacomo, the Tenafly Borough Administrator, explained that:

> The holiday decorations placed on utility poles are paid for by local businesses. This is done through the Chamber of Commerce. The purpose is to promote a shopping atmosphere in downtown Tenafly during the holiday season. They remain in place for approximately six weeks. They are intended to be nonde-

nominational and are certainly nonreligious. They are intended to convey a wintry holiday theme and nothing else.

(DiGiacomo Second Aff. ¶ 4.) Mindful that if "it looks like a duck, walks like a duck and quacks like a duck, it's a duck--not a platypus," [22] the Court finds that the decorations are what they are: decorations. They do not constitute symbolic speech as that term is understood in a constitutional sense. *See Spence v. Washington,* 418 U.S. at 410-411, 94 S.Ct. 2727.[23]

Even if the holiday displays do have some de minimis expressive value, they are of a fundamentally different character than the *lechis.* First, it is arguably commercial speech, since it is paid for by local businesses and placed by the Chamber of Commerce, in order to promote a holiday shopping atmosphere. Just because a municipality allows commercial speech in a nonpublic forum does not mean that it must subsequently permit religious or political speech in that same nonpublic forum. *See Children of the Rosary v. City of Phoenix,* 154 F.3d 972 (9th Cir.1998)(opinion of White, Associate Justice, (Ret.)).

Second, the holiday displays exists for only six weeks a year, as distinct from the proposed permanent installment of the *eruv.* Since it is axiomatic that even in a public forum a municipality may impose reasonable time, place, and manner restrictions on access, a determination by the Borough that it did not wish to have a permanent private religious installation in its right-of-way could form a reasonable basis for its denial, so long as it did not allow any other permanent private expressive installations.

Finally (and most importantly), the holiday displays are not expression of the same character as the *lechis.* When a municipality opens a closed forum for limited uses, the constitutional right of access extends only to uses of similar character. *Perry,* 460 U.S. at 48, 103 S.Ct. 948. Had Plaintiffs been denied access to place their own secular seasonal display on the poles, they might well have a claim for viewpoint discrimination, but that is not what has occurred in this case. Rather than seeking access for use of a type that had previously been permitted by the Borough, Plaintiffs attempted to break new ground by asking for a permanent religious installation on closed municipal property.

The remaining examples of utility pole usage cited by Plaintiffs are also unavailing. Even though the tying of ribbons around utility poles as an expression of discontent with the proposed regionalization of Tenafly's schools likely constituted symbolic speech, *see Tinker,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, the Court lacks sufficient information to conclude that 1) the Borough was aware the ribbons existed, and 2) that the Borough at least tacitly approved of their private maintenance in the right-of-way.

Regardless, one prior instance of unauthorized use of the utility poles for politically expressive purposes hardly demonstrates a differential application of Ordinance 691 by the Borough in this case. Similarly, examples of private residents putting up house numbers or lost dog notices (which the Borough has subsequently endeavored to remove) also fail to support the thesis that the Borough permits some expressive uses of

---

**22.** *Pieper v. Commercial Underwriters Ins. Co.,* 59 Cal.App.4th 1008, 1014, 69 Cal.Rptr.2d 551 (1997).

**23.** Similarly, seasonal greenery and even Christmas trees have been routinely held to have no religious content. *See, e.g., Lubavitch Chabad House, Inc. v. City of Chicago,* 917 F.2d 341, 345 (7th Cir.1990).

the utility poles but denies similar religious expression on the basis of either its religious message or the speaker's viewpoint.

Although the Court has concluded that the utility poles are the relevant forum for its analysis, what if the relevant nonpublic forum is not just the utility poles, but the entire municipal right-of-way? Plaintiffs point to the church directional signs as evidence that the Borough's denial of their application amounted to viewpoint discrimination, since Tenafly Ordinance 691, which governs the right-of-way and utility poles equally, was not enforced against the churches' expressive use of the right-of-way. By Plaintiffs' argument, since the utility poles are in the right-of-way, and since the church signs are in the right-of-way, by opening the right-of-way to the permanent expressive church signs the Borough has placed itself in a position where it cannot subsequently deny Plaintiffs' request for access to the poles for their own permanent expression. Even though this argument appears to have merit, in the final analysis the court concludes for a number of reasons that it is not enough to sustain a determination that the Borough is engaging in viewpoint discrimination.

In the first place, the Borough never considered the placement of the church signs at all, let alone considered whether the signs expressed an acceptable religious viewpoint. In fact, when the Borough Administrator was confronted with the issue of the signs, he initially thought that the signs were in the county right-of-way. (4/30/01 Tr. at 56:16-21.) Although the Borough Administrator did note after further review that some of the signs were in fact in the Borough right-of-way, he also noted that they had not been erected by the

Borough, were not authorized by ordinance and "[had] been allowed to remain as they serve a public purpose in that they provide directions to motorists." (DiGiacomo Aff. ¶ 6.)

Second, the Court finds that the signs are not intended to express a religious viewpoint, or any other viewpoint for that matter. The evidence demonstrates that the Borough permits their continued maintenance on public property because they serve the utilitarian function of providing traffic directions. That the signs contain Christian symbolism is, if at all relevant, marginal to the purpose of the signs, since no one has questioned their primarily directional purpose. In any event, the Borough has written to the churches requesting that they remove any religious symbolism from the signs.[24]

Given the purely functional nature of the signs, similar to the holiday displays the Court finds that the church directional signs are of a different character than the *lechis,* and that simply because the Borough opened its right-of-way to one does not mean that it necessarily had to open its right-of-way to the other. Had Plaintiffs been denied access for placement of a directional sign to their Temple the Court's analysis would be different, but again that is not what occurred in this case.

■ With the exception of the church signs, Plaintiffs have failed to provide the Court with any other examples of the right-of-way's use for private expression. Although there is evidence that businesses have been permitted to place signage advertising their establishments in the right-of-way immediately adjacent to their property, (Pls.' Ex. 7), as previously noted opening the right-of-way to some commercial speech does not necessarily require

24. At the time of the July 19, 2001 oral argument, the churches had yet to comply with the Borough request. (*See* Nelkin Suppl. Aff. ¶ 3.)

opening it to core political or religious speech. Similarly, it is both hardly surprising and constitutionally irrelevant that the right-of-way has been opened to non-expressive private uses such as the placement of sprinklers, and that the utility poles have been used for private utility uses such as Metricom's transmitters. Given the foregoing, vital to the Court's conclusion that there has been no Free Expression violation here is the finding that none of the past or present private uses of the right-of-way are in any way similar in character to the access now requested by Plaintiffs.

In operation, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 (*citing Perry*, 460 U.S. at 46, 103 S.Ct. 948). In this Court's opinion, none of the foregoing facts are sufficient to sustain a conclusion that in applying Tenafly Ordinance 691 against Plaintiffs' request, the Borough has effectively tolerated some private expression in the right-of-way but denied to Plaintiffs comparable access on the basis of their specific motivating ideology, opinion or perspective. In fact, the weight of the evidence points to the fact that as a general rule, Tenafly does not tolerate any private, non-commercial expression in its right-of-way.

For example, an ordinance forbids the placement of garage sale signs on utility poles in Tenafly, or elsewhere in the right-of-way. (Tenafly Ordinance 99-24, attached to DiGiacomo Aff. as Ex. A.) House numbers on utility poles are not permitted either, and homeowners are required to remove them when the Borough becomes aware of their existence. (Id.) By the Borough's account, these regulations which prohibit the private placement of signage in the right-of-way are strictly enforced. (*Id.*)

Since Borough of Tenafly Ordinance 691 is content neutral, and since there is no evidence that the Borough has tolerated some expressive uses of the poles while prohibiting other such uses on the basis of the message conveyed, the only issue remaining in this discussion of viewpoint discrimination is whether the Borough Council's motive in denying permission to attach the *lechis* to the utility poles might be relevant to the Court's analysis. Once again the *Grossbaum* line of cases is instructive. After the Indianapolis-Marion County Building Authority lost to Rabbi Grossbaum in *Grossbaum II,* it adopted a ban on all displays in the lobby of the Government Building, except on displays maintained by government tenants. Rabbi Grossbaum and other plaintiffs again sought an injunction, but again lost at the trial court level. *See Grossbaum III.* On appeal the plaintiffs argued that even though the new rule was viewpoint neutral on its face and in its application, its adoption had been unconstitutionally motivated by the desire to retaliate against the plaintiffs for previous litigation and to discriminate against their religious viewpoint.

 After a thorough analysis of the role motive plays in constitutional adjudication, the Seventh Circuit Court of Appeals concluded that when the government enacts a content-neutral speech regulation for a nonpublic forum, the intent of the government actors in instituting that regulation is irrelevant. *Grossbaum IV,* 100 F.3d at 1298. Regardless of the intent of the government officials, the regulation is constitutional so long as it treats all viewpoints equally on its face and is neutrally applied. *Id.; see also Children of the Rosary v. City of Phoenix,* 154 F.3d at 980 (in nonpublic forum city may implement neutral policy to allow commercial speech but

exclude political and religious speakers, so long as policy does not reflect intent to use policy to exclude disfavored perspectives on issues).

"Where ... the government enacts a content-neutral speech regulation for a nonpublic forum, there is no concern that the regulation is 'in reality a facade for viewpoint-based discrimination.'" *Grossbaum IV,* 100 F.3d at 1298 (*citing Cornelius,* 473 U.S. at 811, 105 S.Ct. 3439.) Because Tenafly Ordinance is a content-neutral speech regulation, and because there is no evidence that as applied it discriminated against Plaintiffs' viewpoint, the Court concludes that the Borough Council's motive in electing to enforce Tenafly Ordinance 691 is not relevant to its Free Expression analysis.

Because neither the utility poles nor the right-of-way are traditionally or by overt governmental act dedicated to public discourse, they are nonpublic forums for private expressive purposes.[25] In that framework, the Court concludes Tenafly Ordinance 691 is a reasonable, facially neutral restriction on access to the right-of-way, that as applied did not have the effect of discriminating against Plaintiffs' viewpoint. Accordingly, the decision of the Borough Council to enforce Ordinance 691 and to deny Plaintiffs' request for access to the utility poles for purposes of religious expression did not violate the Free Expression Clause of the First Amendment.

### B. *Free Exercise*

Plaintiffs also argue that when the Borough Council denied their request to maintain the *lechis* on the utility poles in order to establish an *eruv*, the Borough violated their right to the Free Exercise of their religion under the First Amendment. The argument takes several forms: first, the Borough should be required to accommodate their need for an *eruv* to facilitate their observance of the Sabbath; second, by denying them an *eruv* the Borough Council impermissibly infringed on the exercise of their religion; and finally that the Borough Council discriminatorily applied Tenafly Ordinance 691 when it denied their request, because they wanted to keep Orthodox Jews from moving into Tenafly.

■ While the Court is certain that the accommodation argument makes sense to Plaintiffs, the Court is just as certain that it is without merit under existing constitutional jurisprudence. Tenafly Ordinance 691 is a neutral regulation of general applicability. Everyone is bound by it. No one has the right to use the poles for either expressive speech or religious exercise. Given this generally applicable restriction, the accommodation of Plaintiffs' request would amount to granting a sectarian religious group preferential access to governmental property, and would violate the Establishment Clause. *See Pinette,* 515 U.S. at 766, 115 S.Ct. 2440.

■ Moreover, because the municipality has a strong interest in preserving the property under its control for its intended use, it may permissibly deny Plaintiffs access to the utility poles. That holds true even if the denial of access to the property results in an incidental burden to the Free Exercise of their religion. Whatever claim the Eruv Association might have to use the

---

**25.** The Court is mindful of the Seventh Circuit's observation that "the nonpublic forum case is easier because of the stronger government interest in controlling property not dedicated to public discourse, and because of the lesser role that nonpublic fora generally play in the marketplace of ideas." *Grossbaum IV,* 100 F.3d at 1299 (*citing Perry,* 460 U.S. at 49, 103 S.Ct. 948, *and* Richard A. Posner, *Free Speech in an Economic Perspective,* 20 Suffolk U. Rev. 1, 52 (1986)).

utility poles in the right-of-way, that claim does not divest the government of its right to control "what is, after all, its land." *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 453, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). The First Amendment restrains certain governmental interference with religious exercise; it does not require governmental action to facilitate that religious exercise. As Justice Douglas put it:

> The fact that government cannot exact from me a surrender of one iota of my religious scruples does not, of course, mean that I can demand of government a (benefit), the better to exercise them. The Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government.

*Sherbert v. Verner*, 374 U.S. 398, 412, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

In arguing that the Borough's denial has interfered with the Free Exercise of their religion, Plaintiffs rely principally on two cases, one from the Third Circuit and the other from the Supreme Court, neither of which are applicable to the facts of this case. In *Brown v. Borough of Mahaffey*, 35 F.3d 846 (3d Cir.1994), the Borough Council voted to erect a gate on its property to prevent the plaintiffs from having access to a contiguous property on which the plaintiffs intended to hold a tent revival meeting. The Third Circuit held that where deliberate interference with religious activity is alleged, the pivotal issue is not the extent of the burden on religious exercise, but instead whether defendants intended to impose a burden. 35 F.3d at 848.

In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the City of Hialeah enacted ordinances that were purportedly intended to prevent cruelty to animals by precluding their ritual slaughter, but that were in fact targeted at the Santeria religion. The Supreme Court held that the ordinances were impermissible, because they were neither neutral nor of general application, and because the City did not have a compelling governmental interest that would justify targeting religious activity. 508 U.S. at 547, 113 S.Ct. 2217.

In the case at hand, Tenafly Ordinance 691 is a pre-existing, neutral law of general applicability. By enforcing it, the Borough Council has neither "intentionally imped[ed] the plaintiffs' religious activity" as in *Brown*, nor enacted an ordinance targeting the plaintiffs' religious activity as in *Hialeah*. Accordingly, even if the denial of access to government property imposes an incidental burden on Plaintiffs' religious exercise, there needs to be no compelling governmental interest to justify it. *See Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In the face of Ordinance 691, Plaintiffs had no right to the use of the utility poles in the first place; therefore at worst the Borough only incidentally interfered with Plaintiffs' exercise of their religion by denying them a use to which they were not entitled. An incidental burden of this type can not form the basis of a Free Exercise violation. *See Bowen v. Roy*, 476 U.S. 693, 702, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986); *Lyng*, 485 U.S. at 449, 108 S.Ct. 1319.

The last facet of Plaintiffs' Free Exercise claim, that the Borough Council was motivated by a discriminatory animus in its enforcement of Tenafly Ordinance 691, is the most serious and the most troublesome issue in the case. Plaintiffs argue that:

> the purported rationale for the decision of the Council denying the plaintiffs the

right to maintain the *eruv* is a pretextual afterthought. The real reason comes through loud and clear in the contemporaneous statements and even in the affidavits of the defendants--the Council did not want an eruv because it would attract more Orthodox Jews to the community.

(Plaintiffs' Reply Memorandum of Law, p. 3.)

In this case, the parties have provided evidence of the history of the dispute, including comments from the public and some Council members made prior to the Council's decision, as well as affidavits which were prepared and submitted after the vote took place. All of the Council members who voted and several other key witnesses also testified before the Court at the evidentiary hearing. This evidence has been set out at length in the first part of the Opinion. What was said and done is largely undisputed; what is disputed is the meaning of it all.

Plaintiffs argue that the affidavits and testimony of the Council members demonstrate that the Council was motivated by discriminatory animus. In support of their argument, they rely on a number of particular statements made by various Council members. By way of example, Councilman Wilson testified that by creating an *eruv* "there is a tendency over the years to then have only people of that particular Orthodox Jewish faith to live in that neighborhood." (Wilson Tr. 78:14-16.) Councilman Lipson testified that he feared that an eruv would lead to the establishment of many small houses of worship, and that he wanted to keep Tenafly "the way it is." (Lipson Tr. 23:20-24; Lipson Aff. ¶ 12.) Councilman Peck acknowledged that denying an eruv would adversely impact those Orthodox Jews who felt an eruv was necessary and were contemplating a move to Tenafly. (Peck Tr. 106:10.) Councilwoman

Kerge said in effect, that the concept of building an Orthodox Jewish community "within a community poses serious questions for Tenafly." (Kerge Tr. 52:7-15; Kerge Aff. ¶ 9.). Councilman Sullivan in his affidavit stated that "the TEAI erected an eruv in a manner that presented and created a situation, causing much dissension in Tenafly. The failure to find harmony and to compromise by seeking to establish an eruv with natural boundaries weighed upon my decision." (Sullivan Aff. ¶ 7.)

In view of these statements, and other testimony of Council members Wilson, Lipson and Kerge, it is the Court's conclusion that one of several factors motivating at least three of the members of the Borough Council was a concern about the perceived communal divisiveness that an eruv would generate. That having been said, the Court wants to make it quite clear that there is no evidence to support a conclusion that the Borough Council acted out of animosity to Judaism in general or to Orthodox Jews in particular. The court finds credible the testimony of all the members of the Council that their vote was not affected in any way by any animosity or prejudice against Orthodox Judaism or that they harbored any animosity or prejudice against Orthodox Jews. As Councilman Sullivan stated:

Tenafly is ecumenical. It is the proud home of a vibrant, Orthodox Jewish community and synagogue. The town has an Orthodox Greek Church, an Armenian Orthodox Church, a Reformed Jewish Synagogue, a Roman Catholic convent, a Roman Catholic priory, a Carmelite rectory and numerous Protestant denominated Houses of Worship. Hindus, Muslims and Buddhists also reside in Tenafly. The town is proud to share its cultures and religious traditions. I believe that we as citizens can help each other rather than permit gov-

ernment to dictate how we practice religion through fiat.

(Sullivan Aff. ¶ 5.)

While the members of the Council did not vote out of animosity or prejudice against Orthodox Jews, one of the reasons they did vote to deny the Plaintiffs' application was because of the perceived divisiveness and exclusivity that an *eruv* would generate in Tenafly. This desire to deny an *eruv* in part because of the perceived trouble associated with the creation of a "community within a community" certainly qualifies as a constitutionally impermissible motive for denying Plaintiffs' request to append *lechis* to the utility poles.

 Having reached that conclusion, however, the Court notes that the "leap from nefarious motive to constitutional violation . . . is by no means an automatic one under constitutional case law." *Grossbaum IV*, 100 F.3d at 1292. The Court concludes that even though a constitutionally impermissible factor formed part of the Council's motivation in denying Plaintiffs' request, the existence of that impermissible motive does not suffice to grant Plaintiffs the relief requested, because the Borough has also articulated a compelling interest for its denial of the *eruv* application.

 Although normally, "[t]he First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general," and normally "the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons," *Lukumi*, 508 U.S. at 532, 113 S.Ct. 2217, a law which targets religion in a non-neutral manner may be valid if "it is justified by a compelling interest and is narrowly tailored to advance that interest." *Lukumi*,

508 U.S. at 533, 113 S.Ct. 2217 (internal citations omitted).

Avoiding an entanglement with religion clearly concerned the Borough Council. The Court concludes that a substantial factor leading to the decision by the Borough not to permit Plaintiffs' request for access to the utility poles was the Council's concern about dedicating municipal property on a permanent basis for religious purposes.

Because all of the members of the Council testified, the Court was afforded an opportunity to assess their credibility and evaluate the truth of the statements in their affidavits in light of their trial testimony. With respect to their reasons for denying the erection of the *lechis* and the creation of the *eruv*, the Court finds their hearing and affidavit testimony to be credible. The court rejects Plaintiffs' argument that the reasons given were pretextual or after-the-fact justifications.

In support of the conclusion that the Council wished to keep permanent religious installations out of its right-of-way, the Court looks to statements made by all of the Council members. By way of example, Councilman Wilson stated in his Affidavit:

> What I found most ominous however in the rational for erecting an eruv was the permanency of the installation once completed. This would be in sharp contrast to other religious symbols currently erected on Borough properties temporarily for a matter of weeks to celebrate the holiday season. This includes the menorah, which is erected on a Borough park for a limited number of days each year.

(Wilson Aff. ¶ 7.) At the evidentiary hearing Wilson reiterated his concern about approving a religious symbol of a permanent nature in the public right-of-way, and noted that it was something the Borough

council had never permitted before. (Wilson Tr. at 84:5-25.) Similarly, Councilman Lipson stated in his affidavit that:

> the main reason I voted against allowing an eruv to be established on public property is that I believe it will be disruptive. I am very upset at the comments made by orthodox Jews against those of us who are Jewish who do not agree with them. I think the tone of the attack on Tenafly in the papers filed by the TEAI shows that I am right in thinking that an eruv leads to anger and strife within a town.

(Lipson Aff. ¶ 10.)

Councilman Peck also stated in his affidavit his reasons for denying Plaintiffs' request. Among others, one of his concerns was about allocating public property for religious use:

> To give a right to use public property and land permanently for a particular religious purpose would establish a precedent for the similar granting of rights to any groups who request them in the future.

(Peck Aff. ¶ 3.) Peck also questioned on what ground local authorities would pick and choose between multiple, perhaps mutually exclusive, requests for religious use of municipal property. (*Id.*) Additionally, "[s]ince [Plaintiffs] also believe that only a civil authority can grant permission for an *eruv*," Councilman Peck was concerned that "such a request would bring the civil authority to act on behalf of a particular religious group. This appears to me to violate the constitutional separation of church and state." (Peck Aff. ¶¶ 3, 5.)

In her affidavit, Councilwoman Kerge said that it was her understanding than a town is free to permit or deny an *eruv*, and that as she understood it "an eruv is an accommodation the absence of which does not in any way prohibit the free practice of religion," and that the Borough's right-of-way "should not be used for symbolic or religious or accommodation purposes for any group." (Kerge Aff. ¶¶ 8,11.)

Lastly, at the evidentiary hearing Councilman Sullivan was asked on cross-examination to explain what he meant by "free association" in paragraph 4 of his Affidavit, which reads:

> After careful reflection of the eruv, I discerned that the eruv is an explicit religious symbol that, while not necessarily required to practice Orthodox Judaism, does designate the area enclosed by an eruv as reshut hayachid. Certain Orthodox rabbinical writings refer to the reshut hayachid as the religious extension of the home, a private domain. There, I determined that the eruv contravenes the rights of Tenafly's residents to free association without religious and government interference.

(Sullivan Aff. ¶ 4.) Councilman Sullivan responded:

> I did not think it proper that the eruv be established in a manner that would involve both the government and a religious entity. And as a consequence, it was my feeling that we had best try to stay clear of the issue, and that is what I meant by that "free association."

(Sullivan Tr. 9:19-23). Given his beliefs, Councilman Sullivan worked to find a compromise so as to avoid having the *eruv* on public property. (Sullivan Tr. at 28:8-10.)[26]

---

**26.** These efforts on the part of Sullivan seem to demonstrate that at least some of the Council members did not object to the *eruv*, per se, but objected only to its placement on public property. From this the Court concludes that the restrictions the Borough Council placed on Plaintiffs were narrowly tailored to further their interest in avoiding the appearance of an Establishment Clause concern, since permit-

Much has been made by Plaintiffs of comments by the Mayor, comments that she denies making or now contends were misconstrued. This factual dispute need not detain the Court, since the Mayor did not and could not vote on the resolution. Plaintiffs nevertheless contend that the Mayor played a pivotal role in the decision making process. There is no evidence for this. Just the contrary. At the July 8, 1999 work session the mayor argued in favor of the *eruv*, but obviously no one on the Council adopted her position. This is not surprising, since the evidentiary hearing left the Court with the impression that each of the members of the Council are very independent-minded individuals.

Finally, Plaintiffs argue that any concerns expressed by the Borough about the public's perceptions as to religious endorsement must be pretextual, because the Borough tolerates the use of its property for other religious purposes. Plaintiffs have not, however, produced any evidence that the other uses (i.e. the Good Friday March, or the easter egg roll) are at all similar to the circumstances in this case, namely that they consist of permanent

constructs on nonpublic municipal property, that would raise the specter of Establishment Clause concerns. What to a layman may be inconsistent uses of municipal property may under existing constitutional jurisprudence result from the conflict between what is prohibited with what is permissible.[27] In any event, there is no evidence that the Borough has authorized symbolic religious speech on municipal property in such a way that would allow the Court to conclude that its refusal to permit *lechis* on the utility poles in its right-of-way evidences an intent to discriminate against Orthodox Jews, or that its "appearance of entanglement" concerns are anything less than sincere.

Similarly unavailing is Plaintiffs' argument that because the Borough Attorney had advised the Council that it could permit the *eruv* without violating the Establishment Clause, the preceding argument about avoiding the appearance of entanglement must be pretextual.[28] Even though Defendants did receive the advice in question, there is no reason to doubt that the Council members were legitimately concerned about the *appearance* of the propri-

---

ting an *eruv* on private property would generate no such concerns.

27. Any exercise which attempts to reconcile permitted and prohibited uses would take us far afield and into Establishment Clause jurisprudence, an area of the law which has its own peculiarities. *See American Civil Liberties Union of New Jersey v. Schundler*, 931 F.Supp. 1180 (D.N.J.1995). In *Schundler*, a trial judge enjoined Jersey City from maintaining on city hall plaza a holiday display containing creche, menorah, and Christmas tree, but permitted a modified display that included Santa Claus, Frosty the Snowman and Kwanzaa symbols, thus "sufficiently demystifing the holy." On appeal, the original display was affirmed but as to the modified display reversed and remanded. 104 F.3d 1435 (1997). On remand the District Court reversed itself and enjoined the modified display, only to have that decision reversed by another panel

of the Court of Appeals which permitted the modified display and observed that the prior panel's language on this issue was dicta. 168 F.3d 92 (1999).

28. Amicus argues that complete analysis of the case is not possible without a determination of whether the erection of an *eruv* violates the Establishment Clause, particularly in light of the concerns of the members of the Council on that very question. The Court declines the ACLU's invitation. First, the parties early in the case advised the Court that the Establishment Clause was not an issue in the case, and did not brief it. Secondly, Defendants are not claiming any affirmative Establishment Clause defense to either viewpoint or Free Exercise discrimination. Finally, the Court need not reach the Establishment Clause in light of the result reached in this decision.

ety of such a use, both as a matter of Borough policy and as a matter of what implications permitting such use would have for the future. As previously noted, the Court finds the Council's testimony on this issue to be credible.

This is supported by the fact that members of the public repeatedly voiced their concern about the legitimacy of using municipal property for religious purposes in light of church state issues. For example, at the July 9, 1999 work session John Wilner, a Presbyterian Minister in Tenafly, expressed his fear that:

I believe this could become a test case in the courts over this matter because there are very strong feelings in the community, Christians and Jews on this. That are concerned that this community maintain a separation of church and state and be committed to diversity.

(7/8/99 Tr. p. 13.) This echoed the perception of some members of the public that the municipality should not be involved with the creation of an *eruv* because of its religious connotations.

There is a paucity of case law in this area. Without ruling on the question directly, the Third Circuit has hinted that maintaining the appearance of religious neutrality could in fact be considered a compelling interest for justifying governmental conduct even when that conduct otherwise burdens religion. *United States v. Board of Educ. for the School Dist. Of Philadelphia*, 911 F.2d 882, 885 n. 5 (3d Cir.1990)(*citing Cooper v. Eugene School Dist. No. 4J*, 301 Or. 358, 723 P.2d 298, 308 (1986), *appeal dismissed* 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987)). Given such concerns, the Court concludes that the Council was perfectly within its rights when it sought to take the church-state issue "off the table" in so far as the use of its own property was concerned, whether or not such a use actually violated the Establishment Clause. *Cf. Cornelius*, 473 U.S. at 811, 105 S.Ct. 3439 (Government property manager's justification for excluding certain groups to quell controversy permissible if not a facade for viewpoint discrimination); *May v. Evansville-Vanderburgh School Corp.*, 787 F.2d 1105, 1109 (7th cir.1986)(desire to avoid potentially disruptive controversy and to maintain appearance of neutrality could justify viewpoint neutral exclusion of speakers from nonpublic forum). After the experiences of Jersey City referred to in footnote 27, and given the potential litigation which faced the Borough of Tenafly over the creche and menorah in its park at the time the *eruv* decision was made, who can blame the Borough Council for wishing to avoid this thorny issue? Because the Court concludes Defendants had a compelling justification for denying Plaintiffs' request, Plaintiffs are not likely to succeed on the merits of their Free Exercise claims.

## C. *Plaintiffs' Fair Housing Act Claim*

Distinct from their constitutional claims, Plaintiffs claim that they are also entitled to relief under the Federal Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.* The relevant portion of the FHA makes it unlawful to:

refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or *otherwise make unavailable or deny*, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a)(emphasis added). Plaintiffs contend that by being denied permission to erect the *eruv*, the Borough Council "otherwise made unavailable or denied" them access to housing in Tenafly, on the basis of their religion.

The phrase "otherwise make unavailable or deny" has been interpreted to reach a

wide variety of discriminatory housing practices.[29] *See, e.g., Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 938 (2d Cir.), *aff'd.* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988)(per curiam). Defendants assert that even if their denial of the *eruv* application was discriminatory, it did not "make unavailable or deny" housing to Plaintiffs, and as a result it did not constitute a "discriminatory housing practice" for purposes of the FHA. Accordingly, Defendants contend that Plaintiffs lack standing to pursue a claim under the FHA.[30]

One of the more frequent uses of the "otherwise make unavailable or deny" language of 42 U.S.C. § 3604(a) has been to prevent discriminatory zoning practices, which are not contemplated by the other provisions of the FHA. *See, e.g., Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Huntington,* 844 F.2d at 938; *U.S. v. City of Black Jack,* 508 F.2d 1179 (8th Cir.1974). In addition to exclusionary zoning, mortgage and insurance redlining, block-busting, racial steering and any "other actions by individuals or governmental units which *directly affect the availability* of housing" also qualify as discriminatory housing practices under the "otherwise make unavailable or deny" language of 3604(a). *Southend Neighborhood Improvement Assoc. v. County of St. Clair,* 743 F.2d 1207, 1209-10 (7th Cir.1984)(emphasis added).

While the FHA is a broadly drafted statute which "reflects Congress's intent to reach every private and public practice that makes housing more difficult to obtain on prohibited grounds," *United States v. Branella,* 972 F.Supp. 294, 302 (D.N.J. 1997), the Court is not convinced that Tenafly's denial of permission for the use of its municipal property was a public practice which directly made unavailable or denied housing. Although Plaintiffs argue to the contrary, none of the cases they cited are analogous to this dispute, since none of those cases held a denied request for the non-housing use of municipal property to be an act which by extension "otherwise made unavailable or denied" housing.

Instead, every one of the cited decisions involved some action by individuals or governmental units which directly affected the availability of housing, by imposing impermissible terms on either its proposed location, the required permissions for its construction, its acquisition, or the demographic composition of its residents. *See, e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (prohibited housing steering practices); *Hack v. President and Fellows of Yale College,* 237 F.3d 81 (2d Cir. 2000)(claim that mandatory co-educational on-campus housing policy made dorms "otherwise unavailable" to those with conflicting religious beliefs); *Huntington,* 844

---

**29.** 42 U.S.C. § 3602(f) defines a "discriminatory housing practice" as any act that is unlawful under 42 U.S.C. §§ 3604, 3605, 3606, or 3617. Therefore, for purposes of this case, pursuant to § 3604 a "discriminatory housing practice" would be any practice which otherwise "makes unavailable or denies" a dwelling to someone on the basis of their religion.

**30.** 42 U.S.C. § 3613 sets forth who may bring a civil action under the FHA. Pursuant to 42 U.S.C. § 3613(a)(1)(A), "[a]n aggrieved person

may commence a civil action ... after the occurrence or the termination of an alleged discriminatory housing practice ..." 42 U.S.C. § 3602(i)(1)-(2) defines an aggrieved person as any person who has either been injured by a discriminatory housing practice, or who believes that such injury is imminent. Accordingly, if a given act about which a plaintiff complains is not a "discriminatory housing practice," they lack standing to bring a claim under the FHA.

F.2d 926 (discriminatory zoning practice); *United States v. Yonkers Board of Ed.,* 837 F.2d 1181 (2d Cir.1987)(decision to confine subsidized housing to minority areas); *Easter Seal Society of New Jersey v. Tp. of North Bergen,* 798 F.Supp. 228 (D.N.J.1992)(discrimination against housing for handicapped); *Woods v. Foster,* 884 F.Supp. 1169 (N.D.Ill.1995)(residence in homeless shelter "otherwise made unavailable" by pattern of sexual harassment by supervisors).

In addition to the foregoing cases, Plaintiffs place great weight on the Second Circuit's decision in *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412 (2d Cir.1995). In that case, residents of Airmont, New York, voted to incorporate their community as a village, so that they could wrest control of zoning ordinances away from the Town of Ramapo. *LeBlanc-Sternberg,* 67 F.3d at 418. The residents' express desire in so doing was to prohibit the construction of home synagogues, which were at that time permitted by the Town zoning ordinance. *Id.* In modifying the ordinance, the proponents of incorporation wished to prevent an influx of Orthodox Jews into Airmont. *Id.*

Plaintiffs argue that according to *LeBlanc-Sternberg,* a group of Orthodox Jews have standing to bring an FHA claim when a discriminatory municipal decision has a chilling effect on their desire to move into a community. Because the contention is too broad, the Court disagrees. Standing under the FHA is not created by a discriminatory decision that impacts a plaintiff's desire to move to a community, but instead by a decision which impacts their ability to do so. In *LeBlanc-Sternberg,* the impermissible governmental act was a discriminatory change to municipal zoning regulations, which not only chilled the plaintiffs desire to move into a community, but also denied them a previously permitted religious use of their own homes. Such a decision necessarily had the impermissible effect of "making unavailable or denying" housing, since Plaintiffs could no longer construct the homes they desired (i.e. those with synagogues).

The circumstances in Tenafly are distinct. Although Plaintiffs do contend that the denial of the *eruv* application would have a direct impact on the availability of housing to those Orthodox Jews who require an *eruv* to lift, carry, and push on the Sabbath, the Court disagrees. Instead, the Court concludes from Plaintiffs' own statements and conduct that the absence of an *eruv* merely impacts on the *desirability* of housing in Tenafly. Despite Plaintiffs contentions that they can not live in an area without an *eruv,* (see, e.g., Brenner Cert ¶ 6), and that the absence of the "necessity" of an *eruv* in a given area makes the housing in that area "otherwise unavailable" to them on the basis of their religion, Plaintiffs own conduct and testimony mandate a different conclusion.

In practical terms, according to the testimony of an *eruv* proponent, Observant Jews may live in a town without an eruv. (Agus Tr. 122:11-12). This is supported not only by Mr. Agus's words, but by the conduct of Chaim and Yosifa Book, Stefanie Dardick Gotlieb and Erez Gotlieb, and others. (Yosifa Book Cert. ¶ 2; Stefanie Dardick Gotlieb Cert. ¶ 2). All of these individuals moved to Tenafly prior to the construction of an *eruv,* and all of these individuals were presumably able to go about the practice of their religion without an *eruv,* so long as they did not lift, carry, or push on the Sabbath.

Although the evidence demonstrates that Plaintiffs have lived in and could continue to live in Tenafly without an *eruv,* the Court does not doubt Mr. Agus's assertion that an *eruv* affords those who believe in it a significant enhancement to

the practice of their religion. (Agus Tr. 122:11-12). Even Councilman Sullivan conceded that the absence of an *eruv* would adversely impact the lives of those who believed in it. (Sullivan Tr. 16:24). It is undisputed that life without an *eruv* is more difficult than life with an *eruv*, because without an *eruv* Plaintiffs' own faith prohibits them from lifting, carrying, or pushing on the Sabbath. That sincerely held belief effectively means that without an *eruv*, Plaintiffs can not carry their young children to worship services, or carry a picnic basket to the local park. Unless Plaintiffs are able to construct an *eruv*, their faith teaches them that they must abide by those faith-imposed burdens. If they are able to construct an *eruv* their faith then lifts those burdens. Unburdened, the practice of their religion is necessarily enhanced, because they have greater freedom of movement on the Sabbath.

■ Given these competing obligations of faith, Plaintiffs would have the Court, using the FHA as a mechanism, compel the Borough to open its right-of-way, so that they could construct their religious demarcation, and allow their faith to lift the burdens that their has faith imposed on them. This request is not one to make Tenafly more available to a religious group, but instead to make houses within the boundary of the *eruv* more appealing to that religious group, since Plaintiffs' faith would permit them to live in those houses free of the burdens that their faith imposes on them on the Sabbath. The Court does not agree that denial of such a request, even if made for unconstitutional reasons, would make that housing "less available" to Plaintiffs. The Court reaches this conclusion in part because, even if the Tenafly *eruv* were dismantled tomorrow, *eruv*-observant Jews who presently live

outside of Tenafly would be just as free to purchase homes in Tenafly as *eruv*-observant Jews were to purchase homes in Tenafly prior to the *eruv's* construction. While those *eruv*-observant Jews would admittedly be less inclined to move to Tenafly without an *eruv*, they would still be just as free to move to Tenafly if they wished.

■ Noting that the FHA is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons, *Southend Neighborhood Improvement Assoc. v. County of St. Clair*, 743 F.2d 1207, 1209-10 (7th Cir.1984), Plaintiffs have failed to demonstrate that declining to make an area a more appealing choice for a religious minority, even if done for discriminatory reasons, is an FHA violation. Although Plaintiffs believe that unfettered access to the right-of-way is a requirement for the free exercise of their religion, and although Plaintiffs have indicated that they do not wish to remain in Tenafly without that access, the Court can not conclude that denial of access to a public right-of-way for the private construction of a religious installation "otherwise makes unavailable or denies" housing, even if that housing is now less appealing to a religious group than it once had the potential to be. To conclude otherwise would be to create an FHA claim in every circumstance where a religious group is denied a request to use municipal property to make an area more appealing for the private practice of their religion. While discriminatory denials of such requests on the basis of religion can and should result in Free Exercise claims, the Court has not been presented with any evidence that Congress intended the FHA to overlap every Free Exercise claim that might impact on a person's desire to move to a

given area.[31]

■ The Court is mindful that generally, courts ought to be more reluctant to grant FHA relief when asked to compel a defendant to take affirmative step to ensure integration, than when asked to enjoin a defendant from interfering with a plaintiff's private conduct in support of integration. *Metropolitan Housing Development Corp. v. Arlington Heights*, 558 F.2d at 1283. "To require a defendant to . . . utilize his land for a particular purpose, or take other affirmative steps toward integrated housing is a massive judicial intrusion on private autonomy." *Id.* In this case, the Borough of Tenafly did not reach out to burden Plaintiffs' housing choices, but instead declined to grant permission for a private use of Borough property. While the Court does find that this denial of the *eruv* application undoubtedly made housing in Tenafly less attractive to Plaintiffs, the Court concludes that the FHA does not impose on a municipality the affirmative obligation to honor all requests for the use of its right-of-way that might make a community more attractive to a given religious group.

The Court simply does not see how a decision which declines to alter the *status quo* and fails to make an area more attractive to a religious group somehow makes the housing in that area less available or more difficult to obtain. Even if the decision of the Borough Council was discriminatory, the Court can not conclude that it "otherwise made unavailable or denied" housing, and that therefore it was a "housing practice" sufficient to establish standing under the FHA. Accordingly, the Court concludes that Plaintiffs lack standing pursuant to 42 U.S.C. § 3613, and therefore do not have a likelihood of success on the merits of their FHA claims.

## III. CONCLUSION

Because of the publicity surrounding this dispute, the tireless efforts of the parties, and most importantly the fundamental interests at stake in this litigation, the Court has painstakingly set forth both the direct events and external circumstances that lead to the Borough of Tenafly's decision to deny Plaintiffs' request to maintain *lechis* on Verizon's telephone poles in the municipality's right-of-way.

The contentiousness generated by Plaintiffs' application is clearly reflected in the comments of the public speakers at the numerous Borough Hearings and Work Sessions. Those comments included a broad range of opinions, including statements that undeniably reflected the biases and prejudices of those who made them. Equally true, however, is the fact that many of those comments reflected legitimate concerns about the propriety of committing public property permanently for a religious purpose, and the apparent entanglement with religion that might result.

This conflict over the use to which public property should be put is evident in the candid explanations given by the members of the Borough Council, both in their affidavits and in their live testimony. It is obvious to the Court that the Council was faced with a novel request that generated

---

**31.** Any contrary conclusion raises the prospect that the FHA might swallow the Free Exercise clause whole, for presumably any housing located in a municipality that trampled on a religious group's Free Exercise rights would become *per se* less attractive to members of that religious group. By application of this reasoning, in the oft-cited Free Exercise case of *Church of the Lukumi Babalu Aye v. Hialeah,* members of the santeria faith could have brought FHA claims against the City of Hialeah, for when the city's unconstitutional ordinances curtailed their faith, they would have been forced to live elsewhere in order to fully practice their religion.

considerable public concerns about possible constitutional violations, and presented a range of other public policy issues.

Unfortunately, it is apparent to the Court that in addition to the aforementioned concerns about how municipal property should be used, the Borough Council also weighed some improvident and constitutionally impermissible factors when making their ultimate decision. While the Court is convinced that the Borough Council did not act out of some deep seated anti-Semitism or hatred for religion in general, even if some of the motives for their denial were objectionable the Court concludes that the Borough Council did not violate Plaintiffs' rights, either constitutional or statutory, for the following reasons.

First, after an examination of all the evidence, the Court must conclude that the utility poles and the right-of-way are not public forums, or even limited public forums for speech. Since they were never used for public discourse, and were never committed to that purpose, the utility poles and the right-of-way are undoubtedly a nonpublic forum. Given such a nonpublic forum, absent any evidence that others were granted comparable access while Plaintiffs were denied it, or that Plaintiffs were denied access they otherwise would have received based solely on their viewpoint, regardless of the Council's motive the Court holds that a decision to enforce a reasonable, neutral access restriction of general applicability can not have amounted to viewpoint discrimination.

Second, the Court is convinced that the fundamental reason animating the Borough Council's decision was its concern that public property should not be permanently allocated to a religious purpose. In making this decision, the Borough Council was not targeting the Orthodox Jews, but was instead targeting permanent religious installations on property to which the public typically does not have a right of access. Under the circumstances of this case, this decision as to how municipal property should be used was ultimately a legitimate legislative decision by an elected representative body whose responsibility it was to make just this kind of decision, and who acted out of a compelling interest. Since the Borough Council's decision was narrowly tailored to prohibit only conduct that might generate the appearance of an entanglement between church and state, no constitutional infirmities resulted, and there is no cause for a court to second guess such a decision.

Absent a likelihood of success on their underlying constitutional claims, the Court concludes that Plaintiffs' are also unlikely to succeed on their 42 U.S.C. §§ 1983 and 1985 claims. For the reasons discussed at length in the Opinion, Plaintiffs have similarly failed to demonstrate a likelihood of success on their remaining FHA claims. Since Plaintiffs have failed to demonstrate that they are likely to eventually succeed on any of their claims, the application for a preliminary injunction is **denied** and the temporary restraining order is **dissolved**.

An appropriate Order follows.

Appendix A

*Lechi,* attached to Verizon Telephone Pole in Borough of Tenafly

Plaintiffs' Ex. 35(a)

Appendix B

Verizon telephone ground wire, attached to Verizon Utility Pole in Borough of Tenafly

Plaintiffs' Ex. 36(a)

Appendix C

Tenafly Chamber of Commerce holiday
display, attached to Verizon Utility
Pole in Borough of Tenafly

Nelkin Aff. Ex. B